OWEN OF GEORGIA, INC., Plaintiff-Appellee, Cross-Appellant,

v.

SHELBY COUNTY; Roy Nixon, Mayor of Shelby County; Pidgeon-Thomas Iron Company, Defendants-Appellants, Cross-Appellees.

Nos. 78–1013–1014.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 29, 1980.

Decided May 15, 1981.

As Amended June 17, 1981.

Leo Bearman, Jr., Memphis, Tenn., James McDonnell, Jr., Memphis, Tenn., for defendants-appellants, cross appellees.

Frierson M. Graves, Jr., Heiskell, Donelson, Adams, Williams & Kirsch, Memphis, Tenn., for plaintiff-appellee, cross appellant.

Before KEITH and MARTIN, Circuit Judges, CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

This diversity case deals with the ability of an unsuccessful bidder to challenge the decision by a municipality to award a public contract to another bidder. Owen of Georgia, Inc. submitted the low bid for the structural steel portion of a contract to build the Shelby County Criminal Justice Center for Shelby County, Tennessee. The contract was awarded to the second-lowest bidder for the steel package, Pidgeon-Thomas Iron Company. Owen then filed this lawsuit seeking to have the contract between Pidgeon-Thomas and Shelby County declared null and void; to require Shelby County to award the contract to Owen; or to have Shelby County compensate Owen for expenses and lost profits resulting from the award of the contract to Pidgeon-Thomas instead of Owen. The district court concluded that Owen lacked standing to seek mandamus, injunctive relief, or damages, but did have standing to seek declaratory relief. Interpreting the bidding procedure requirements of the Shelby County Restructure Act, the district court proceeded to issue a declaratory judgment holding the award of the contract to Pidgeon-Thomas invalid and void. We reverse the district court's decision that Owen lacks standing to sue, affirm the district court's issuance of declaratory relief, dismiss as moot the claims for mandamus and injunctive relief, and remand for a determination of damages.

I.

The facts are virtually undisputed. In 1977, Shelby County, through its legislative branch, decided to construct a Shelby County Criminal Justice Center under the supervision of a construction manager who would supervise the erection of the complex. In due course, the county advertised for bids on the various components of the project which was budgeted at $38,000,000.00 and divided into about 90 "bid packages". Bid package 0500 dealt with structural and miscellaneous steel. Five companies submitted bids on bid package 0500 in March, 1977; Pidgeon-Thomas submitted the lowest bid and Owen, the third lowest bid.

All of the bids exceeded the budgeted amount. Roy Nixon, Mayor of Shelby County, instructed his architect to review Pidgeon-Thomas' bid with company officials in an effort to reduce the overall amount of the bid. The county's architect and engineer negotiated with Pidgeon-Thomas, changing the specifications to reduce the cost of the steel package. Even after such reductions, however, the Mayor concluded that Pidgeon-Thomas' bid was still too high, and, therefore, he rejected all bids on that package.

Shelby County then advertised for new bids with changed specifications, indicating that the negotiations with Pidgeon-Thomas

would not put any other company at a competitive disadvantage. Bid package 0500 now included only structural steel, with the miscellaneous steel comprising a separate package. When the new bids were opened on May 11, 1977, Owen's bid of $2,585,000.00 was the lowest bid. Pidgeon-Thomas was the second lowest bidder at $2,625,625.00.

Shortly thereafter, Mayor Nixon instructed the county architect to award the 0500 contract to Pidgeon-Thomas even though Owen was the low bidder. Mayor Nixon purportedly rejected Owen's bid in favor of Pidgeon-Thomas for two reasons. First, Shelby County was committed to an affirmative action program which included participation by disadvantaged minorities in the construction of the Criminal Justice Center. This policy was expressed in general terms to all bidders, and all bidders were required to submit statistical reports to Shelby County regarding the status of minority employment in their businesses.[1] The reports filed by Owen and Pidgeon-Thomas reflected that Pidgeon-Thomas employed a higher proportion of minorities than did Owen. Second, it was allegedly the policy of Shelby County to encourage participation by local Shelby County firms in the construction of county projects.[2] Pidgeon-Thomas is a local Shelby County firm; Owen is a Georgia firm. For these two reasons the Mayor rejected Owen's bid and recommended to the County legislative body, the Quarterly Court, that Pidgeon-Thomas be awarded the contract for package 0500. Before this recommendation was forwarded to the Quarterly Court, however, Pidgeon-Thomas agreed to reduce its bid to a figure identical to Owen's bid. In addition, the specifications were changed to provide that the County would itself purchase the steel and make an adjustment for sales tax.[3]

On May 16, 1977, Mayor Nixon submitted a resolution to the Quarterly Court recommending that the bid for structural steel be awarded to Pidgeon-Thomas. At that time the Quarterly Court was not advised that Owen was originally the low bidder, that Pidgeon-Thomas had reduced its bid to match Owen's low bid, or that Pidgeon-Thomas was chosen because it was a local concern with the better minority employment record. The Quarterly Court proceeded to approve the contracts for the construction of the Criminal Justice Center. Among those contracts approved was that of Pidgeon-Thomas.

When Owen learned of the contract award to Pidgeon-Thomas, it objected and through its attorney contacted Mayor Nixon to request reconsideration since Owen was the low bidder. As a result of Owen's objections, the issue was resubmitted to the Quarterly Court on June 23, 1977. Owen's attorney appeared and challenged the Mayor's rationale for preferring Pidgeon-Thomas. Nevertheless, a motion to substitute Owen for Pidgeon-Thomas on bid package 0500 was rejected by the Quarterly Court. The Mayor subsequently executed a contract with Pidgeon-Thomas for the structural steel package.

On the above facts, the district court found that Owen lacked standing to seek or obtain mandamus, injunctive relief or damages because there was no evidence of fraud or bad faith on the part of the defendants. The trial court then decided that Owen did have standing to seek a judgment declaring the contract void. The applicable section of the Shelby County Restructure Act provides:

All open market purchase orders or contracts shall be awarded to the lowest bidder who is financially responsible, taking into consideration the qualities of the articles to be supplied, their conformity to

---

1. Both Owen and Pidgeon-Thomas were found to be in compliance with EEOC and OFCC regulations—a prerequisite for eligibility to bid for Shelby County Government contracts.

2. The record does not reflect that this policy was published in order to notify the bidders.

3. The County also agreed to indemnify Pidgeon-Thomas for any sales tax that might be assessed against Pidgeon-Thomas.

specifications, their suitability to the requirements of the County government, and the delivery terms. Any and all bids may be rejected for good cause.

The trial court proceeded to hold that the term "good cause", as set out in the second sentence of the Act, permits rejection of the low bid only in the circumstances delineated in the first sentence of the Act. Although the District Judge found no fraud or bad faith on the part of any of the defendants, and found no loss to the taxpayers of Shelby County, he held that the contract was awarded in violation of the competitive bidding procedures required under the Shelby County Restructure Act. He therefore held the contract award to Pidgeon-Thomas invalid. Owen now appeals the ruling that it lacks standing to seek or obtain preventive, specific or monetary relief. Defendants appeal the ruling that Shelby County's award of the steel package to Pidgeon-Thomas was not authorized by the Shelby County Restructure Act.

## II. STANDING

██ The district court, while recognizing a split of authority on the standing issue and the absence of any Tennessee decisions dealing with the issue raised in the present case, held that under the "unusual circumstances" of this case Owen lacked standing to challenge Shelby County's award of the contract to Pidgeon-Thomas. To reach this result, the court relied upon the broad discretion conferred upon elected officials by Tennessee law[4] and upon the absence of fraud, bad faith or surplus cost to the taxpayers.[5] Although a few courts have proffered the absence of bad faith by the solicitor as a rationale for denying an aggrieved bidder standing, *see Standard Engineers and Constructors, Inc. v. United States EPA*, 483 F.Supp. 1163, 1168 (D.Conn.1980);

*Menke v. Board of Education of West Burlington*, 211 N.W.2d 601 (Iowa 1973), this factor is not dispositive of the question. Our role in this diversity action is to determine the ruling that we believe the highest Tennessee court would adopt.

The Tennessee courts have not directly addressed the issue of whether an unsuccessful bidder, such as Owen, has standing to challenge action of an awarding authority which is asserted to be in violation of a state or local statute. Several decisions, however, treat the issue of standing in related contexts. Particularly instructive is *Knierim v. Leatherwood*, 542 S.W.2d 806 (Tenn.1976), where the court held that a private citizen has standing to bring suits to protect public roads when that citizen has sustained special injury or damage. In *Knierim* the Tennessee Supreme Court overruled a case decided three-quarters of a century before which denied standing to private residents seeking to enforce the rights of the public in roads and bridges. The *Knierim* court rejected the older, narrow approach as being "in conflict with the rationale, reasoning and result of countless subsequent cases decided by our courts." *Id.* at 810. Only when the complaining party has no special pecuniary or proprietary interest in the public road will he or she lack standing.

██ The court noted that the doctrine of standing in Tennessee law is essentially judge-made with no hard and fast rules, and the purpose of the doctrine is to make certain that the proper party is advancing the claim. Thus, property owners whose land abuts a public road have acute and compelling rights in a highway which are not common to the public generally. The focus in *Knierim* is thus on whether the

---

4. The prevailing policy was to liberally construe municipal powers. The Shelby County Restructure Act, Article I, Section 1.01 provides: It is the intent of this chapter that the limitations on the powers of the County government shall be strictly construed; and that grants of power to County government shall be liberally construed.

5. We reject the boot-strap argument advanced by the defendants that any illegality in the bidding award procedures was rectified when Pidgeon-Thomas lowered its price to match that of Owen's. While this action may insure that no additional costs are imposed upon the taxpayers, it destroys the nature of competitive bidding and circumvents the requirements of the Shelby County Restructure Act.

plaintiff has a special interest defined in terms of potential, or realized, injury. Here, a private citizen would be hard pressed to demonstrate any monetary injury from the award of the contract to Pidgeon-Thomas, since Pidgeon-Thomas lowered its bid, after the bids were opened, to match the low bid of Owen. Having Pidgeon-Thomas provide the structural steel for the Criminal Justice Center worked no apparent financial harm to the taxpaying citizens of Shelby County. In stark contrast to this absence of injury is the situation of a low, qualified bidder—here Owen—which suffers serious adverse economic consequences from illegal action. Not only is the low bidder deprived of anticipated profits, but the deprivation "throws an undue overhead burden on the remainder of the contractor's work and may cause the contractor to lose key field personnel that it cannot readily employ." *Funderburg Builders v. Abbeville City Memorial Hospital*, 467 F.Supp. 821, 825 (D.S.C.1979). Under the *Knierim* rationale, Owen's special pecuniary interest gives it standing to contest the contractual grant to Pidgeon-Thomas as illegal under the bidding procedures of the Shelby County Restructure Act.[6]

▪ We believe this approach to the standing doctrine is consistent with the developments charted by the Tennessee courts. Indeed, it has long been the law in Tennessee that private citizens, as such, can maintain an action complaining of the wrongful acts of public officials if they aver a special interest or a special injury not shared by the public. *Bennett v. Stutts*, 521 S.W.2d 575, 576 (Tenn.1975); *Badgett v. Broome*, 219 Tenn. 264, 409 S.W.2d 354 (1966); *Skelton v. Barnett*, 190 Tenn. 70, 227 S.W.2d 774 (1950); *Patton v. City of Chattanooga*, 108 Tenn. 197, 65 S.W. 414 (1901).

The aim of these cases is to insure that the appropriate party, one uniquely positioned by virtue of status or injury, is cast in the role of plaintiff. Subsequent decisions confirm this interpretation. In *Corporation of Collierville v. Fayette County Election Committee*, 539 S.W.2d 334 (Tenn. 1976), the court, characterizing standing as a "perennial problem", held that only a municipal body, not a private citizen, has standing to sue to invalidate the charter of a proposed city. Since the establishment of a city is an inherently public matter, it may only be redressed in an action brought by a representative of the state. In *Payne v. Ramsey*, 591 S.W.2d 434 (Tenn.1979), a Republican candidate in a general election was denied standing to contest his Democratic opponent's eligibility to have been a candidate in the Democratic primary. The correct parties to prosecute such an action, the court noted, were designated by statute as the Democratic candidate's primary opponents. *See also Dobbins v. Crowell*, 577 S.W.2d 190, 193 (Tenn.1979).

Even looking beyond Tennessee law to the recent restrictive decisions of the Supreme Court we would find that Owen would have standing. As a prospective, and here the low bidder for Shelby County business, Owen clearly has economic interests at stake which give it standing. Its injury in fact is loss of business and profits which is "fairly traceable to the defendants acts or omissions." *Village of Arlington Hts. v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). Since Owen was qualified and capable of performing the work, its injury is a type "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). A helpful analogy is the decision last term in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), where several associations of construction contractors filed suit for declaratory and injunctive relief alleging that they had sustained economic injury due to enforcement of the Minority Busi-

---

**6.** As the issues are not before us, we refrain from deciding whether a taxpaying citizen or a qualified, unsuccessful bidder who is not the low bidder would have standing to challenge the award of a public contract under the circumstances present here.

ness Enterprise (MBE) provisions of the Public Works Employment Act of 1977. The MBE provisions required that at least 10% of federal funds granted for local public works projects be used by the state or local grantee to procure services or supplies from businesses owned by minority group members even though they might not be the lowest bidders. Although the Supreme Court did not rule on the issue of standing, it apparently accepted as sufficient the petitioners' allegations that in several instances they sustained economic injury because one of their members would have been awarded a public works contract but for enforcement of the MBE provisions. 448 U.S. at 480 n.71, 100 S.Ct. at 2776 n.71. *See also Central Alabama Paving, Inc. v. James,* 499 F.Supp. 629 (M.D.Ala.1980). In the present Case, Owen alleges that it, as low bidder, would have received the structural steel contract but for the invocation of the minority employment and local concern policies by Shelby County. This loss of business is sufficient to convince us that the Tennessee courts would conclude Owen has standing.

Our conclusion that Owen has standing is also consistent with the majority of federal court decisions, which have held that unsuccessful bidders for government contracts have standing to invoke judicial review of adverse procurement decisions. *Sea-Land Service, Inc. v. Brown,* 600 F.2d 429, 432 (3rd Cir. 1979); *Kinnett Dairy, Inc. v. Farrow,* 580 F.2d 1260, 1265 (5th Cir. 1978); *Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080, 1086 (6th Cir. 1975); *Airco, Inc. v. Energy Research and Development Administration,* 528 F.2d 1294, 1296 (7th Cir. 1975); *Armstrong & Armstrong v. United States,* 514 F.2d 402, 403 (9th Cir. 1975); *Wilke v. United States,* 485 F.2d 180, 182–83 (4th Cir. 1973); *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 866–68 (D.C. Cir.1970); *cf. Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1201 (2d Cir. 1977); *contra, Edelman v. Federal Housing Association,* 382 F.2d 594, 597 (2d Cir. 1967); *Self-Powered Lighting, Ltd. v. United States,* 492 F.Supp. 1267, 1272 (S.D.N.Y.1980).

Accordingly, we hold that Owen has standing to contest the award of the contract to Pidgeon-Thomas.

## III. AUTHORITY UNDER STATE LAW

The Shelby County Restructure Act mandates that the contract "shall be awarded to the lowest bidder who is financially responsible ...", but also provides that "Any and all bids may be rejected for good cause." Owen of Georgia is, by the defendants' own admission, financially responsible. The sole reasons given by Mayor Nixon for rejecting Owen's low bid in favor of Pidgeon-Thomas were that Pidgeon-Thomas was a local concern, whereas Owen was an out-of-state firm, and Pidgeon-Thomas' minority employment record was superior to that of Owen's.

Shelby County contends that justification for its rejection of Owen is provided by that sentence in the Restructure Act which permits rejection of any and all bids for "good cause." To the county, Owen's status as an out-of-state contractor with a less impressive minority employment record constituted good cause for disqualifying Owen from receiving the contract. In support of this open ended reading of the statute, Section 1.01 of the Restructure Act is cited. That section provides that "limitations on the power of county government shall be strictly construed, and that grants of power to county government shall be liberally construed." The District Court rejected the approach urged by the county and held that the term "good cause" referred solely to those reasons or circumstances delineated in the first sentence of the paragraph. Under this interpretation, the only grounds on which a bid may permissibly be rejected are that the bidder is not financially responsible; the bidder offers to furnish inferior quality merchandise or materials; the bidder's proposal is not in conformity with the specifications; the bidder offers supplies or articles that are not suitable to the requirements; or the bidder's delivery terms are objectively inferior or substantially less desirable than another acceptable bidder.

 Both constructions are too extreme. Under Tennessee law a court should construe a statute so that no part will be inoperative, superfluous, void or insignificant and that one section will not destroy another. *In re Gasteiger*, 471 F.Supp. 13 (D.C.Tenn.1977); *Tidwell v. Collins*, 522 S.W.2d 674 (Tenn.1975). Where doubt exists, a statute is not to be extended by implication, or enlarged by construction so as to embrace matters not specifically covered therein. *National Life & Acc. Ins. Co. v. United States*, 381 F.Supp. 1034 (D.C. Tenn.), *aff'd* 524 F.2d 559 (6th Cir. 1974). Furthermore, the statute must be construed so that the intention or purpose of the legislature is ascertained and given effect. *Jackson v. Tennessee Valley Authority*, 462 F.Supp. 45 (D.C.Tenn.), *aff'd* 595 F.2d 1120 (6th Cir. 1979); *State v. Doe*, 588 S.W.2d 549 (Tenn.1979); *Parkridge Hospital, Inc. v. Woods*, 561 S.W.2d 754 (Tenn.1978); *Dorrier v. Dark*, 537 S.W.2d 888 (Tenn.1976). It is beyond cavil that the primary objective is to promote the public interest by obtaining the lowest possible price that competition among responsible bidders can secure. *See State v. Dugger*, 172 Tenn. 281, 111 S.W.2d 1032, 1034 (1938); *Johnson City v. Carnegie Realty Co.*, 166 Tenn. 655, 64 S.W.2d 507, 508 (1933). The overriding fiscal policy behind the Restructure Act demonstrates that the interpretation urged by Shelby County that it may arbitrarily reject a low bid by merely reciting the statutory language "good cause", and injecting previously unannounced criteria to provide meaning to the phrase, would be contrary to the intent of the statute. This conclusion is reinforced by the express limitations imposed by the statute on the awarding authority's ability to reject the lowest bid. These constraints should not be interpreted out of the statutory language. We do not believe that the Tennessee courts would construe the Act as granting unlimited discretion to the County to award contracts based upon some undefined and elusive concept of "good cause".[7]

A contrary conclusion would require us to ignore the mandatory language of the Restructure Act and would render the factors outlined in the Act as valid grounds for rejection mere surplusage. To accept Shelby County's argument that it has an absolute right to reject the lowest responsible bidder based upon uncodified policies, and may do so merely by invoking the magic words "good cause", would be to give no meaning to the statutory language that "all . . . contracts shall be awarded to the lowest bidder who is financially responsible, taking into consideration . . . (the enumerated factors)."[8]

 The narrow construction adopted by the District Court, allowing consideration of only the factors which are expressly codified, suffers from the same infirmity. Under such an interpretation the "good cause" provision is rendered inoperative, for if "good cause" is held to include only the enumerated factors, the phrase becomes superfluous. Our task is to construe the Restructure Act in a manner which preserves the integrity of each clause while keeping the statute internally consistent. *Tidwell v.*

---

7. Cf. *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977) (term "good cause" as used in the Wisconsin Fair Dealership Law allowing cancellation of dealership agreements for good cause was not unconstitutionally vague because it was fully and precisely defined by statute so as to give the grantor of the dealership adequate notice as to when it would be violating the Act by attempting to cancel a dealership without good cause).

8. The language in the advertisement and bidding document reserving the discretion to "reject any and all bids" and to award the contract regardless of by whom bid or how bid cannot change the result. The instructions to bidders contained the following language: "The owner reserves the right to select an award of a contract on or to reject any package or grouping of packages by any bidder or bidders as the owner may choose regardless of by whom bid, how bid, time bid, or sequence of bid so long as any award falls within the valid bid time period set out herein."

The advertisement for bids informed all prospective bidders that "the owner reserves the right to reject any or all proposals and to waive any informalities." Insofar as these instructions are inconsistent with the Shelby County Restructure Act, they must be disregarded. The Act, not the bid advertisement, constitutes the law controlling the award of the contract.

*Collins, supra.* Two canons of statutory construction provide a method for harmonizing the provisions of the Restructure Act. The *ejusdem generis* rule of statutory construction provides that where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. 2A Sutherland, *Statutory Construction,* (4th ed. C. Sands 1973) Sec. 47.17; *see also City of Knoxville v. Brown,* 195 Tenn. 501, 260 S.W.2d 264 (1953). Concomitantly, the maxim *noscitur a sociis* ("it is known from its associates," Black's Law Dictionary 1209 (Rev. 4th Ed. 1968)) acknowledges that general and specific words are associated with and take color from each other, restricting general words to a sense analogous less general. *See e. g. Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961); *Reed v. Long,* 327 F.2d 611, 614–15 (6th Cir. 1964). For example, in *Third National Bank v. Impac Limited, Inc.,* 432 U.S. 312, 97 S.Ct. 2307, 53 L.Ed.2d 368 (1977), the Supreme Court affirmed a decision of the Tennessee Supreme Court, citing the familiar principle that words grouped in a list should be given related meaning and applying it to an issue of statutory construction regarding a state court's issuance of a temporary injunction against a national bank.

■ Applying these rules to the Restructure Act allows the meaning and boundaries of the term "good cause" to be gathered from context. In this respect, the "good cause" provision entitles the County to reject bids on grounds other than those specifically enumerated in the Restructure Act. However, the phrase "good cause" must be read *ejusdem generis* to refer to other factors of the same genre as those enumerated by the specific words. While a bid may be rejected for reasons other than those enumerated, the County must cite factors similar to the ones listed, i. e., factors which go to the heart of the contract. In order for rejection to be based on the "good cause," the proffered reason must relate to something which affects the County's bargain to substantially the same degree that, for example, inferior quality goods or non-conforming goods affect it. Poor workmanship on a previous job is one example of such a factor.

■ The reasons cited by the County in the present case—that Pidgeon-Thomas employs a higher proportion of minorities and is a local concern—do not constitute "good cause" for rejecting the other bid. These factors simply do not affect the County's bargain to the same extent that factors such as those specifically enumerated affect it. They are important ancillary concerns; however, in considering them the County strays farther from the primary purpose of the Restructure Act than a proper construction of the Act permits. These concerns are not recognized in state or local statutes, but represent the County's beliefs on controversial social and economic questions. The County's affirmative action program, expressed in Sec. 7 of the Restructure Act, insures that prospective bidders comply with the fair employment practices specified by the EEOC.[9] It also permits the

---

**9.** Section 7 provides that the County Department of Equal Opportunity Compliance shall:

(a) Review and implementation of fair employment practices, as specified by Equal Employment Opportunity Commission guidelines, in all departments of County Government under the jurisdiction of the County Commission or County Mayor, if there be one;

(b) Update and monitor and effective affirmative action program;

(c) Review all proposed contracts in which County funds are expended to insure that non-discriminatory employment practices are being executed on all levels of employment as specified by Equal Employment Opportunity Commission and Labor Department regulations;

(d) Investigate claims and complaints of discriminatory practices arising in County Government departments under the jurisdiction of the County Commission, or County Mayor, if there be one;

(e) Design, implement and monitor programs to increase minority business participation in the letting of county contracts;

(f) Such other duties as may be required by the County Commission, or County Mayor, if there be one;

County Department of Equal Opportunity Compliance to compile statistics regarding minority participation in the work forces of potential bidders. The statute does not provide that a bidder's proportionate minority employment is a factor which will be taken into consideration when awarding a County contract. Rather, it operates as a qualifying mechanism; a finding of compliance with the Act renders a firm eligible to submit a bid. Both Owen and Pidgeon-Thomas were found to be in compliance and that finding ends the role of Sec. 7 in contract awards. Even further astray from the legitimate reasons under the Act for rejecting Owen's bid is the County's "local concern" policy, which appeared only as an *ex post facto* justification for awarding the contract to Pidgeon-Thomas. The Restructure Act as well as the bid advertisements are silent as to any preference for local firms. Shelby County never notified prospective bidders of its intent to favor local businesses when awarding County contracts. Moreover, the defendants have not drawn our attention to any other of the 90 bid packages where these policies were enforced. The district court was correct in

concluding that if two contractors furnish the requisite element of financial responsibility, and one contractor's bid is lower than that of the other, the awarding authority may not disregard the low bid on the ground that the more expensive bidder has greater minority employment or is a local concern. The Shelby County Restructure Act does not embody a concept of "relative superiority" which allows award of the contract to some other bidder because he was "better qualified" than the lowest bidder. Our construction of the Act, however, allows the County the necessary flexibility by permitting rejection of a bid for "good cause" when the good cause is in the nature of the specific provisions.

▆ While the County certainly has the authority to reject all bids, as it did when the first bids were submitted here, contracts subject to the provisions of the Restructure Act cannot properly be awarded to a party other than the lowest responsible and eligible bidder unless that bidder is disqualified on the basis of an enumerated criterion or similar "good cause" reason.[10] *See Associated General Contractors of Cali-*

---

(g) The Director shall have the power to require each firm or business contracting with the county to submit with their proposals and/or bids statistics revealing the percentage and number of minorities at all levels of said firm or business.

10. The dissent agrees that our task is to construe the term "good cause" in a manner which does not render the preceding language of the Act superfluous. The dissenting opinion states that "The reasons proffered by Shelby County are "good cause" within the meaning of the Act for accepting Pidgeon-Thomas' bid, since those reasons do not make superfluous the other requirements dealing with financial responsibility and quality of the goods." That construction reads the enumerated factors right out of the Act; it is unnecessary to list criteria for the awarding authority to consider if that body can then turn around and invent its own criteria. More importantly, the dissent disregards the directive that the contract "shall be awarded to the lowest financially responsible bidder . . . ."

The dissent makes much of the fact that Pidgeon-Thomas lowered its bid to match that of the low bidder. Leaving aside the inconsistency of that action with the nature of the secret competitive bidding process, we agree that the taxpayers sustained no additional cost here, but find that fact to be irrelevant in construing

the Act. The dissent's approach would still permit acceptance of Pidgeon-Thomas' bid even if it were, say, 25% higher than the lowest bid. That result conflicts with the public interest, as defined by the Tennessee courts construing competitive bidding statutes, of obtaining the lowest possible price from a responsible bidder.

The cases analyzed by the dissent do not dictate a different outcome. The *United States Wood Preserving Company v. Sundmaker*, 186 F. 678 and *Bancamerica-Blair Corporation v. State Highway Commission*, 265 Ky. 100, 95 S.W.2d 1068 (1936) decisions involved statutes which allowed award of the contract to the "lowest and best bidder." The awarding authorities were therefore required to determine who was the best as well as the lowest bidder. The use of the subjective term "best," coupled with the absence of specific factors to be considered when awarding a contract, were plenary delegations of discretionary authority. It follows that in such situations the appropriate standard of review would be abuse of discretion. Since the Act in the present case does not vest the awarding authority with such wide latitude in passing on bids, it presents a distinctly different situation.

*fornia v. San Francisco Unified School District*, 616 F.2d 1381, 1385 (9th Cir.) *cert. denied* sub nom.; *National Ass'n of Minority Contractors v. Ass'n of General Contractors*, —— U.S. ——, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980); *Funderberg Builders v. Abbeville City Memorial Hospital*, 467 F.Supp. 821, 824–25 (D.S.C.1979); *Inglewood-Los Angeles County Civic Center Authority v. Superior Court*, 7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601 (1972); *Commonwealth v. Gill*, 5 Mass.App. 337, 363 N.E.2d 267, 270 (1970). Since Shelby County did not justify its rejection of Owen on any permissible ground, that rejection was clearly wrong and the award of the contract to Pidgeon-Thomas invalid.

## IV. REMEDIES

▆ As a general rule, a declaratory judgment and an injunction are the only adequate means of protecting the public interest, the integrity of the competitive bidding process, and the rights of the individual bidder. Owen obtained declaratory relief in the court below, but was denied the preventative relief it sought—an injunction forbidding the award of the contract to Pidgeon-Thomas. It is now too late for injunctive relief to be effective because at oral argument we were informed that construction of the Criminal Justice Center was substantially complete. Accordingly, we dismiss as moot Owens' claims for injunctive relief. For the same reason, we also dismiss as moot the claim for mandamus, without ruling on the availability of this type of relief.[11]

▆ Despite the unavailability of specific or preventative relief, there remains the question of damages. With a great degree of conviction but seemingly little theoretical acumen, Owen sought to recover the expenses it incurred in its unsuccessful participation in the competitive bidding process, the costs incurred in its litigation to set aside the award of the contract to Pidgeon-Thomas, and the profits it allegedly lost by reason of its failure to obtain the award of the contract. Shelby County contends that such a cause of action against it cannot be recognized in view of the overwhelming authority that the competitive bidding requirements of contracts for public works exist to protect the public rather than the bidders. The County notes that Owen could not have compelled the Quarterly Court to award the contract to it because of the provision in the Restructure Act which permits rejection of *all* bids. We agree that, in line with the Act, Shelby County was not obligated to actually award the contract to a bidder regardless of the bid price. Owen, even as the lowest responsible bidder, had no vested or contractual right to the award of the contract. This absence of any entitlement to the contract compels us to conclude that Owen cannot recover anticipated profits as damages as it never entered into the contract, and could not command that it receive the contract under which it would have made such profits. *See e. g. Excavation Construction, Inc. v. United States*, 494 F.2d 1289, 1290, 204 Ct.Cl. 299 (1974); *Funderburg Builders, supra*, 467 F.Supp. at 825.

This conclusion, however, does not leave Owen without any remedy for the violation of the Act's competitive bidding section by Shelby County. By virtue of those bidding procedures, the County invited bidders to respond. Those procedures protect the local government's interest as well as the interests of those who respond to the County's invitation. The public contracting authority is able to obtain the lowest price for its

---

11. We observe in passing that the courts have uniformly held that a writ of mandamus directing a public authority to award a contract to a particular (low) bidder is not available as relief. This is because the public entity is not required to award a contract in light of the express or implied authority to reject all bids. Under this philosophy, a bidder, even the lowest responsible bidder, has no vested or contractual right to the award of the contract. *See e. g. A & A Construction Company, Inc. v. The City of Corpus Christi*, 527 S.W.2d 833 (Tex.1975); *Weber v. City of Philadelphia*, 437 Pa. 179, 262 A.2d 297 (1970); *William A. Berbusse, Jr., Inc. v. North Broward Hospital District*, 117 So.2d 550 (Fla.1960). And in any event, mandamus is a discretionary remedy under Tennessee law. *State v. Thomas*, 585 S.W.2d 606, 607 (Tenn. 1979).

work from a pool of qualified bidders, and all contractors are placed on an equal footing in the competition to gain the contract. All bidders are assured by the Act that their bids will receive fair and honest consideration.[12] This, too, serves the public interest. "The number of bidders, and thus the range of choice available to an awarding authority, may well be reduced if it were to be assumed by prospective bidders that such an authority would not abide by the applicable statutes in making its awards." *Paul Sardella Construction Co. v. Braintree Housing Authority*, 3 Mass.App. 326, 329 N.E.2d 762 (1975), aff'd 371 Mass. 235, 356 N.E.2d 249 (1976). Indeed, it is doubtful that many contractors would bid at all knowing the deck was stacked against them.

In its solicitation of bids pursuant to the Restructure Act, Shelby County clearly promised to award the contract to the lowest financially responsible bidder *if* it awarded the contract at all. Each prospective bidder could justifiably expect that his proposal would receive fair consideration consistent with this promise. We believe that the Tennessee courts would find that Owen's reasonable and detrimental reliance upon this promise entitles it to dam-

ages under the theory of promissory estoppel.[13] The elements of promissory estoppel are set forth in the decision of *Foster & Creighton Co. v. Wilson Contracting*, 579 S.W.2d 422 (Tenn.App.1978) where the court adopted the generally accepted definition:

> Where one makes a promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forebearance, it is binding if injustice can be avoided only by enforcement of the promise.

Shelby County promised to award the contract to the lowest financially responsible bidder in the event it awarded the contract at all, and in reliance on this promise Owen submitted its bid. This created a type of informal contract, requiring neither consent nor consideration, between Shelby County and Owen (as well as all the other bidders) to award the contract to Owen as the lowest responsible bidder unless it rejected all bids.[14] Consequently, Owen became entitled to damages when Shelby County breached this informal contract by awarding the contract to Pidgeon-Thomas.

12. By submitting a bid a bidder obtains a unique relationship with the County. This relationship was aptly described by the court in *Merriam v. Kunzig*, 476 F.2d 1233, 1242 n.7 (3rd Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973):

> When the government solicits proposals to which bidders in good faith take the trouble to respond, the actual relationship between solicitor and bidder is not the same as before. The bidder has placed in the hands of the representatives of the government the power to bind him to a contract. It is not too much to find the correlative obligation of fair dealing within the terms of the solicitation. . . .

13. We conclude that any claim sounding in tort would be barred by the Tennessee Governmental Tort Liability Act, the pertinent sections of which provide:

> **23–3307. Immunity from suit.**—Except as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from the activities of said governmental entities wherein said governmental entities are engaged in the exercise and discharge of any of their func-

tions, governmental or proprietary. When immunity is removed by this chapter any claim for damages must be brought in strict compliance with the terms of this chapter. Acts 1973, ch. 345, 3.

> **23–3311. Removal of immunity for injury caused by negligent act or omission of employees—Exceptions.**—Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury:

> (1) arises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused, or . . .

> (2) arises out of the issuance, denial, suspension or revocation of or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization, or . . . .

14. To hold that Owen was not entitled to rely upon this promise because of the reservation of the right to reject all bids would make the authority's promise an illusory one.

Owen may recover in promissory estoppel those damages it sustained by reason of its justifiable reliance upon the County's promise—in other words, the expenses it incurred in its unsuccessful participation in the competitive bidding process as well as the costs incurred in its successful attempt to have the award to Pidgeon-Thomas rescinded as having been made in violation of the statute. The initial determination of the amount of damages, however, must rest with the trial court. Accordingly, the case is remanded to the district court to conduct such proceedings as it deems proper for ascertaining the amount of damages which Owen shall receive from the County under the doctrine of promissory estoppel as outlined by this court.[15]

The district court's holding that Owen had no standing to sue is reversed, the declaratory judgment issued below is affirmed for the reasons stated above, the claims for an injunction and mandamus are dismissed as moot, and the case is remanded to the district court for a determination of the damages sustained by Owen in preparing and submitting its second bid for package 0500 and in challenging the award of the contract by Shelby County to Pidgeon-Thomas.

Costs will be taxed to the defendant-appellants—cross-appellees.

KEITH, Circuit Judge, dissenting.

I agree with the majority opinion that Owen of Georgia does have standing to contest the award of the contract to Pidgeon-Thomas. However, I respectfully dissent from the opinion in so far as it holds that Shelby County's rejection of the bid made by Owen of Georgia was a violation of the Shelby County Restructure Act ("Act").

The court misconstrues the "good cause" provision of subparagraph 10(b) of the Act. It contends that the "good cause" provision refers only to the factors specifically enumerated in subparagraph 10(b) or to factors like the enumerated ones. The majority bases this interpretation of the Act on the *ejusdem generis* rule of statutory construction. Under that rule, where general language follows an enumeration of specific categories, the general language is to be construed as applying only to things in the same general class as those specifically enumerated. But *ejusdem generis* is not applicable here. The doctrine only applies "where there is some repugnance or incompatibility between the specific and general expressions" in a statute. *State v. Holman*, 3 McCord 306, 307 (S.C.1825). *See also Villanova v. American Federation of Musicians, Local 16*, 123 N.J.Super. 57, 301 A.2d 467, 468 (1973); *Cheatham v. Wisconsin*, 85 Wis.2d 112, 270 N.W.2d 194, 198 (1978); 2A Sutherland, *Statutory Construction*, (4th ed. C. Sands 1973) § 47.17 (*ejusdem generis* does not apply where there is no inconsistency between specific factors and those based upon general statutory language).[1] There is no "repugnance or incompatibility"

---

**15.** The district court found that Pidgeon-Thomas had not acted in bad faith in inducing Shelby County to award the contract to it. We do not disturb this finding and accordingly conclude that Pidgeon-Thomas is not liable to Owen for any profits it received in performing the contract.

**1.** The Court cites to two Tennessee cases which apply *ejusdem generis: City of Knoxville v. Brown*, 195 Tenn. 501, 260 S.W.2d 264 (1953); *Third National Bank v. Impac Limited, Inc.*, 432 U.S. 312, 97 S.Ct. 2307, 53 L.Ed.2d 368 (1977) (construing Tennessee law). Those cases involved individual interpretations of general language which were patently incompatible with the specific language of the statutes in question.

In *City of Knoxville*, for example, the Tennessee Supreme Court held that Brown violated a city zoning ordinance by using his yard for removal of parts from automobiles and trucks. The city ordinance zoned the area, which included Brown's residence, for one-family dwellings. The ordinance limited land-use to eight enumerated purposes. The "catch-all" provision allowed used "customarily incident to any of the above uses when situated in the same dwelling . . ." 260 S.W.2d at 266.

Brown argued that his use was permitted under the general provision. The court, applying *ejusdem generis*, concluded that Brown's use was incompatible with the specific uses of the property since his use made the land unfit for residential purposes. *City of Knoxville* is inapposite here. As the Court noted in *City of*

between the enumerated factors in the Restructure Act and the factors considered by Shelby County under the "good cause" provision. It is clear that taking into consideration the fact that Pidgeon-Thomas is a local concern and that it employed a larger number of minorities than Owen of Georgia is not inconsistent or incompatible with also taking into account financial responsibility and quality of goods. The two additional factors considered by the County do not conflict with the specifically enumerated ones. Therefore, there is no "repugnance or incompatibility" that would allow this court to apply *ejusdem generis*. Since the doctrine is not applicable the majority has no basis for concluding that the county's actions were outside the scope of the Act.

However, even if a conflict exists and *ejusdem generis* is deemed applicable, the doctrine does not prohibit Shelby County's use of the "good cause" provision which resulted in awarding the contract to Pidgeon-Thomas.

The majority asserts that *ejusdem generis* requires this court to hold that a bid may be rejected for "good cause" only if the rejection is for some reason which goes to the "heart of the contract". The majority concludes that the reasons cited by the

county—that Pidgeon-Thomas employs a higher proportion of minorities than the appellant, and that Pidgeon-Thomas is a local concern—do not go to the heart of the contract, and, thus, do not constitute "good cause" for rejecting Owen's bid.

The court's invocation of *ejusdem generis* and its reliance solely on cases brought pursuant to federal question jurisdiction cannot be countenanced given this court's duty to apply Tennessee law in diversity cases.[2] Even if *ejusdem generis* is applicable here as a general principle of law, the rule must be applied in a manner consistent with other laws of Tennessee. The court is bound to decide this case as the Tennessee Supreme Court would decide it. In determining how the highest Tennessee court would have ruled, the court's construction of Shelby County's bidding statute should have been governed by: (1) Tennessee statutory construction rules, (2) provisions of the Restructure Act granting broad authority to local governments and (3) decisions of states which have bidding statutes similar to the one at issue here. If the Court had properly considered these factors, along with the *ejusdem generis* rule, it would have reached a contrary result.[3]

---

*Knoxville*, no "stretch of the imagination" was required to conclude that a junk yard was a prohibited use in an area zoned for one-family dwellings only. *Id.* at 267. The court further stated that the specific language defined the content of the general language. *Id.* In the present case, the court acknowledges that the "good cause" provisions is separate from the enumerated factors. The facts in *City of Knoxville* are sufficiently different from those in the case at bar to make that case of little precedential value here. *City of Knoxville* is only of aid insofar as it holds that *ejusdem generis* will be applied by Tennessee courts when the doctrine is deemed applicable.

*Third National Bank, supra,* is also of questionable applicability here. The majority cites it for "the familiar principle that words grouped in a list should be given related meaning." In *Third National Bank,* the statute prohibited any attachment, injunction or execution from being issued against a national bank or its property before final judgment in any state or local court. The court held, without reference to *ejusdem generis,* that the legislative intent was to prevent only prejudgment seizure of bank property by creditors, and not to apply to

a mortgagor-debtor's action seeking a preliminary injunction to protect its real property from wrongful foreclosure.

**2.** Two Tennessee cases are cited by the court. *But see* note 1, *supra* for an analysis of their limited applicability to the facts presented here.

**3.** *Ejusdem generis* cannot be applied in a vacuum. *See Sutherland, supra* at § 47.22. In order "[T]o ascertain the meaning of the words of a statute they may be submitted to the test of all appropriate cases of statutory construction, of which the rule of *ejusdem generis* is only one." *Helvening v. Stockholms Enskilda Bank,* 293 U.S. 84, 89, 55 S.Ct. 50, 52, 79 L.Ed. 211 (1934). As the court stated in *Ailor v. Tillery,* 7 Tenn.App. 679, 683 (1927):

The doctrine of *ejusdem generis,* however, is only a rule of construction, to be applied as an aid to ascertaining the legislative intent and does not control where it clearly appears from the statute as a whole that no such limitation was intended. Nor does it apply where the specific words of a statute signify subjects greatly different from one another .... nor when the general words must bear a

## I

Tennessee rules of statutory construction require a broad reading of the "good cause" provision. Under Tennessee law, this court must construe the statute so that no part is inoperative, superfluous, void or insignificant. *In re Gasteigner*, 471 F.Supp. 13 (D.C.Tenn.1977). However, if we adopt the majority's view that "good cause" can only include factors like those enumerated, *i. e.* like inferior quality or non-conforming goods, the provision here becomes superfluous. The enumerated factors specifically address any conceivable problem relating to inferior quality or otherwise non-conforming goods. The enumerated factors require that a municipal contract must be awarded only after the municipality takes "into consideration the qualities of the articles to be supplied, their conformity to the requirements of the county government, and the delivery terms." In my view the majority has added no content whatsoever to the "good cause" provision when it concludes that bids may also be rejected for reasons "like" the goods of the lowest bidder are non-conforming or are of inferior quality. It suggests no examples of "good cause" which are not already listed in the statute because under its analysis there are none.[4] Simply stated, the majority opinion reads the words "good cause" out of the statute. Therefore, the majority opinion renders the "good cause" provision superfluous and inoperative in violation of Tennessee rules on statutory construction. Invocation of the general principle of *ejusdem generis* cannot justify this result, since "where the particular words of a statute exhaust a genus,

there is nothing *ejusdem generis* left and in such a case we must give the general words a meaning outside the class indicated by the particular words." *National Bank of Commerce v. Estate of Ripley*, 161 Mo. 126, 132, 61 S.W. 587, 588 (1901). *See also* Sutherland, *supra* at § 47.21 and cases cited therein.

## II

Not only has the court failed to properly apply Tennessee statutory construction rules, it has failed to take into consideration Shelby County's authority under the Restructure Act. The Act, consistent with the Tennessee rules, also requires that this court give content to the "good cause" provision. In addition, the Act requires that we broadly construe the provision. Section 1.01 reads in relevant part: "Powers and Functions ... It is the intent of this Chapter that the limitations on the powers of county government shall be strictly construed, and that grants of power to county government shall be liberally construed. The majority ignores Section 1.01. Instead of liberally construing the grant of authority in the "good cause" provision, it gives the "good cause" provision the narrowest possible construction by concluding that rejection of the lowest bid for "good cause" is allowed only when the lowest bidder fails to meet an enumerated prerequisite or when the bidder fails to meet a prerequisite "like" an enumerated one. This is inconsistent with a correct application of *ejusdem generis*. *See* note 3 *supra*.

Of course the "good cause" provision cannot be interpreted so as to be without limi-

---

different meaning from the specific words or be meaningless.

More recently, the New Hampshire Supreme Court opined in *State v. Small*, 99 N.H. 349, 111 A.2d 201, 202 (1955):

It is well established that the rule of *ejusdem generis* is neither final nor exclusive and is always subject to the qualification that general words will not be used in a restrictive sense if the act as a whole indicates a different legislative purpose in view of the objective to be obtained.

*See also Mosby v. Wayne County Civil Service Commission*, 360 Mich. 186, 103 N.W.2d 462 (1960); *Mills v. City of Barbourville*, 273 Ky.

490, 117 S.W.2d 187 (1938); *Utica State Savings Bank v. Village of Oak Park*, 279 Mich. 568, 273 N.W. 271 (1937), and *Woodworth v. State*, 26 Ohio St. 196 (1875).

4. In a belated attempt to buttress its interpretation of the statute, the majority states that "poor workmanship on a previous job is one example" of "good cause". While I agree that poor workmanship can be considered good cause under the Act, I disagree that only the majority—not the Mayor and Shelby County Quarterly Court—can determine what constitutes good cause.

tation. For instance, the provision must, like the other provisions, be interpreted so that no other provision becomes superfluous. In my view, the "good cause" provision is properly interpreted if it is read to allow rejection for any reason that does not involve fraud, nepotism, bribery, bad faith, *etc.*, so long as the "good cause" is consistent with the enumerated factors. The reasons proffered by Shelby County are "good cause" within the meaning of the Act for accepting Pidgeon-Thomas' bid, since those reasons do not make superfluous the other requirements dealing with financial responsibility and quality of the goods. As mentioned above, the enumerated factors require that any bid accepted must come from a financially responsible bidder and be for goods or services of the highest quality for the price offered that the County can procure. Pidgeon-Thomas' bid met these criteria and, in addition, it was an attractive bid for the other reasons given by Shelby County. Therefore, I would uphold the County's action as consistent with the statutory scheme of the Restructure Act.

### III

There are no Tennessee bidding cases which outline the parameters of the authority granted to localities under the "good cause" provision. But the Court should have looked to the bidding statutes of other states for guidance. Had the majority reviewed the case law of this circuit and the case law of states within the circuit, it would have discovered that Shelby County's use of the "good cause" provision to promote minority employment and local enterprise is consistent with the uses permitted in other jurisdictions under similar competitive bidding statutes.

Competitive bidding statutes are of two kinds: (1) *discretionary*—which includes grants of authority allowing the lowest bid to be rejected for some reason other than those specifically listed in the particular statute, and (2) *mandatory*—which requires that the locality accept the lowest bid. *See United States Wood Preserving Company v. Sundmaker,* 186 F. 678 (6th Cir. 1911) (con-

struing Ohio law); *Bancamerica-Blair Corporation v. State Highway Commission,* 265 Ky. 100, 95 S.W.2d 1068 (1936) (citing with approval *United States Wood Preserving Co. v. Sundmaker, supra); Weber v. City of Philadelphia,* 437 Pa. 179, 262 A.2d 297 (1970). When a statute allows a locality to reject any and all bids, the courts have not reversed the decision to reopen bidding or to grant contracts to other than the lowest bidders in the absence of proof of fraud, collusion, bad faith or arbitrary action. *Id.* Apparently the majority agrees with Owen of Georgia's contention that these cases are distinguishable from the instant one because the "good cause" provision here is not a similar grant of discretionary authority. But if the "good cause" provision is not a grant of discretionary power to the county, I am at a loss to determine what the provision could mean since, as the county correctly notes, the provision must be interpreted under Tennessee law as making some substantive contribution to the statutory scheme. The language of the statutory provisions at issue in the above-cited cases vary slightly from the wording of the "good cause" provision here, but the Tennessee provision, like those statutes, is clearly of the type which allows the locality considerable discretion in awarding contracts to one other than the lowest bidder.

In *Sundmaker,* for instance, the applicable statute instructed the locality to "make written contract with the lowest and best bidder after advertisement..." The complainant's bid was rejected because the oil it proposed to use did not contain the largest possible amount of anthracene and anthracene oil. The lowest bidder alleged that it should have been awarded the contract, since the advertisement did not make award of the bid contingent upon the amount of the anthracene in the oil. The second lowest bidder received the contract because its oil contained more of the substances. This circuit held that "where authority is given by statute to a Board to let a contract to the lowest and best bidder, discretion is hereby conferred which the courts will not undertake control." 186 F. at 683. In response to a charge by the

complainant that the Board abused its discretion, this court held that it would find an abuse of discretion only where there was fraudulent intent on the part of the Board. The court refused to hold that failure to indicate on the bid advertisement that only the bid with the largest amount of anthracene and anthracene oil would be accepted was fraudulent and thus consisted of an abuse of discretion.

Contrary to the majority's assertion, discretionary competitive bidding statutes do employ a concept of "relative superiority." Implicit in this court's adoption of the abuse of discretion standard of review in *Sundmaker* is the recognition that what is relatively superior, *i. e.* what goes to the heart of a locality's bargain, is a matter on which each locality is best qualified to make the ultimate determination. If the majority opinion had been faithful to the *Sundmaker* analysis, it would not have concluded that it was improper for Shelby County to add the additional factors after bidding had ended. The court in *Sundmaker* clearly allowed the lowest bid to be rejected for a reason not indicated in the advertisement. A locality cannot be expected to know all the important considerations which would affect its bargain at the time bidding commences. The "good cause" provision is included in the Restructure Act to give the county the needed flexibility to consider factors not foreseen when the statute was enacted.

*Sundmaker's* deference to local actions pursuant to authority granted under state bidding statutes is not abberational. *See Bancamerica-Blair Corporation v. State Highway Commission, supra. Bancamerica-Blair* involved a Kentucky statute which authorized the Kentucky Highway Commission to accept the "lowest and best bid" if from a financially responsible bidder, and stated that the Commission could reject "any and all bids made either for materials for construction or for the bonds or any one or more of them." 95 S.W.2d at 1070. There, the Defendant Commission issued, sold and delivered 4½ percent Revenue bonds in an amount in excess of $5,000,000 par value. This issue was refunded by four percent bonds, of which $5,465,000 par val-

ue were outstanding. The State Highway Commission advertised for sealed bids for the purchase of a new issue of refunding bonds in the amount of $5,465,000, with an interest rate not to exceed 3½ percent. Bancamerica-Blair and Blyth & Co. submitted proposals to the Commission. The premium that Bancamerica-Blair agreed to pay was $2,185.50 more than Blyth & Co. agreed to pay. Bancamerica expressly stated that although it would pay the cost of printing the indentures, it would not pay for furnishing, engraving or lithographing the bonds. The differences between the two bids were in the higher premium agreed to be paid by Bancamerica and the provision in the Bancamerica bid concerning cost. When the bids were opened, the Commission indicated to Blyth that the company had not stated its position on the cost issue. Blyth stated, over objection by Bancamerica to this oral modification, that it had previously paid the cost and would do so in this contract. Blyth was awarded the contract as the "highest and best" bidder.

The court held that the Kentucky statute gave the Commission discretionary authority to reject Bancamerica's bid "with or without cause." *Id.* The court further held that whether the price offered by Bancamerica was actually lower than Blyth's was irrelevant. It reasoned that even if the Commission had mistakenly concluded that Blyth's bid was lower, the Commission did not act fraudulently, in bad faith, or collusively. Relying on *Sundmaker*, the court refused to annul the award of the contract without proof of fraud.

*Weber, supra,* like *Bancamerica-Blair* and *Sundmaker,* also supports the proposition that the "good cause" provision here is a grant of discretionary authority which permits any municipal action that does not constitute an abuse of discretion. In *Weber* the provision at issue allowed the city to "reject all bids if it shall deem it in the interest of the city to do so. Otherwise, the contract shall be awarded to the lowest responsible bidder ..." 262 A.2d at 297. The city rejected all seven bids submitted for the operation of a "General Concession"

at the Philadelphia sports stadium because the city's original specifications did not provide for joint operation of the "General Concessions" with a Stadium Club. After it sent out the invitation to bid, the City concluded that such a joinder was in its best economic interest. The court first noted that the following principles, which stem from judicial respect for the doctrine of separation of powers in government, are guideposts: (1) it is to be presumed that municipal officers properly act for the public good; and (2) courts will not sit in review of municipal actions involving discretion in the absence of proof of fraud, collusion, bad faith or arbitrary action. The court held that the clause gave the city a right to reject "any and all bids", and that discretionary authority would not be interfered with by the courts without evidence that the city acted arbitrarily, capriciously, or in bad faith. *Id.* at 302.

If clauses like "a city may reject any and all bids," and a city must accept the bid of the "lowest and best bidder" allow localities to reject bids for the various reasons listed in *Bancamerica, Weber* and *Sundmaker,* then it follows that the "good cause" provision in this case can only be construed in a manner that would at least allow an equivalent amount of discretion here.[5] If there were any doubts about this, Tennessee rules of statutory construction, which do not permit any provisions to be interpreted so as to make it superfluous, and Section 1.01 of the Shelby County Restructure Act, which states that grants of power to the County shall be liberally construed, make clear that the "good cause" provision is a grant of discretionary authority to the county. As the court noted in *Sundmaker,* this grant of

authority should not be curtailed unless an abuse of discretion has occurred.

## IV

The "good cause" provision makes the Restructure Act a discretionary competitive bidding statute; therefore we should affirm the district court's decision. The two reasons given by Shelby County for accepting the bid of Pidgeon-Thomas over the lower bidder, Owen of Georgia, clearly do not approach an abuse of discretion under the tests adopted by this court and by other jurisdictions within this Circuit which have similar competitive bidding schemes and statutory construction rules.

The first reason given by Shelby County for the acceptance of Pidgeon-Thomas' bid was that Pidgeon-Thomas employed a significantly higher proportion of minorities than did Owen of Georgia. The Mayor and the Shelby County Quarterly Court were both committed to an affirmative action program, which included participation by minorities in the construction of the Criminal Justice Complex. The importance of a strong affirmative action program is reflected in a resolution of the Shelby County Quarterly Court adopted September 1976, and signed shortly thereafter by the Mayor.[6] Pursuant to the resolution, and Section VII of the Act, all bidders were required to submit reports to the county concerning minority employment in their businesses. Because of the obvious importance of the affirmative action policy initiated in the Quarterly Court's resolution, the Mayor had "good cause" for awarding the contract to Pidgeon-Thomas instead of Owen of Georgia.[7] The Quarterly Court did not act arbi-

---

**5.** The majority argues that the clause, "lowest and best bidder", at issue in *Bancamerica-Blair, supra,* indicates a grant of discretionary authority, but that the clause in the present case does not indicate a similar grant of authority. This contention flies in the face of any common-sense interpretation of the words, "any bid may be rejected for good cause," used in the clause at issue here.

**6.** *Resolution of Shelby County Quarterly Court Setting Goals for the Participation of Minority Contractors in Construction of the Criminal*

*Justice Complex,* Adopted September 13, 1976, and dated September 19, 1976.

**7.** The majority's reliance on *Associated General Contractors of California v. San Francisco Unified School District,* 616 F.2d 1381 (9th Cir. 1980); *Funderberg Builders v. Abbeville City Memorial Hospital,* 467 F.Supp. 821 (D.S.C. 1979); *Ingelwood-Los Angeles County Civic Center Authority v. Superior Court,* 7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601 (1972); *Commonwealth v. Gill,* 5 Mass.App. 337, 363 N.E.2d 267 (1970), to establish the impropriety

trarily when it approved the award. Moreover, the fact that Shelby County did not announce its intention to take into consideration qualitative differences in affirmative action plans should not be sufficient to annul the award. As indicated in the cases discussed above, such non-disclosure is permissible, with or without cause, where the statute allows for rejection of any and all bids. While I am not certain that Tennessee would adopt a rule that a bid can be denied without cause, it is clear that we need not reach that question because "good cause" has been shown here.

Shelby County provided an important additional reason for its decision to give the bid to Pidgeon-Thomas. The County had a policy of encouraging, as much as possible, participation by local firms in the construction of the Criminal Justice Complex. This policy was part of an attempt to lessen the severe unemployment in Shelby County at the time the bids were issued. The Mayor was of the opinion that awarding the bid to a local concern which employed a considerable number of minority employees would be particularly advantageous, since unemployment among minorities in Shelby County is disproportionately high.

It is of significance that prior to the approval of this contract by the Shelby County Quarterly Court, Pidgeon-Thomas voluntarily agreed to reduce its bid to a figure exactly identical to Owen's bid. The majority contends that the paramount public interest here is having the project completed at the lowest cost. The bid was awarded in a manner consistent with that interest. Also, the bid went to Pidgeon-Thomas, the bidder with the best record of minority employment, and one which is a local concern as well. It is difficult to argue that an aggressive affirmative action program and a municipal policy encouraging the employment of local contractors are against the public interest.[8] It is even more difficult to argue that these considerations by Shelby County constituted fraud, bad faith or arbitrary and capricious action.

## V

In conclusion, I think that the Shelby County government has behaved responsibly and in the public interest. The majority's strained construction of the statute in question is an attempt to substitute its judgment for that of the county, and will only trigger additional litigation by disgruntled bidders. It is unfortunate that the Tennessee Supreme Court is not bound by the judgment of this Court. I cannot agree that the county's reasons are not "good cause" as intended by the Restructure Act. Accordingly, I would hold that Shelby County's award of the contract to Pidgeon-Thomas did not violate the Act.

---

of Shelby County's consideration of the minority employment records of its bidders is misplaced. None of the statutes in these cases contain a "good cause" provision or a similar provision granting discretionary authority to the localities. Thus, the interpretations of those statutes provide no guidance for interpreting the discretionary provision in the Restructure Act.

**8.** The majority argues that my interpretation of the Act would allow Shelby County to accept a bid that was 25% higher than the lowest bid, and that such an act by the County would not be in the public interest. Again, the court is substituting its uninformed judgment as to what is financially desirable for the judgment of the Mayor and Quarterly Court who address the problems and needs of the County on a daily basis. It may be that awarding the bid to a contractor who is charging 25% more than the next lowest bidder is in the public interest. For example, if the bidders are otherwise equal and one is a local concern with considerable minority participation in a county with a sizeable minority population, the higher cost to the county on the contract may be obliterated by the increase in local business activity and employment.