**HOKE COMPANY, INC. and Alley–Cassetty Coal Company, Plaintiffs–Appellants,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant–Appellee.**

No. 87–6028.

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1988.

Decided Aug. 4, 1988.

Rehearing Denied Oct. 4, 1988.

Richard W. Jones, Hurt and Jones, Murray, Ky., Michael J. Zavatsky, Taft, Stettinius & Hollister, Cincinnati, Ohio, Thomas R. McCoy (argued), School of Law, Vanderbilt Univ., Nashville, Tenn., for plaintiffs-appellants.

Edward Christenbury, Gen. Counsel, Tennessee Valley Authority, Knoxville, Tenn., James E. Fox, Deputy Gen. Counsel, Robert C. Glinski, Asst. Gen. Counsel (argued), Melvin L. Harper, for defendant-appellee.

Before MARTIN, MILBURN and GUY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiff, a non-unionized contractor, filed suit against defendant Tennessee Valley Authority (TVA), seeking judicial review of TVA's decision to award a coal purchase contract to a unionized contractor. In response, TVA filed a motion to dismiss or for summary judgment. The district court granted TVA's motion and dismissed the case accordingly. 661 F.Supp. 740. Because we conclude that (1) plaintiffs lacked standing under the competitive bidding statute to challenge TVA's award of the contract to AMCA Resources, Inc. (AMCA); (2) plaintiffs' employees' first amendment right to freedom of association was not violated by TVA's decision to award the contract to the unionized contractor; and (3) TVA did not violate plaintiffs' fifth amendment right to equal protection, we affirm the lower court's order.

I.

Plaintiff Hoke Company, Inc., is a non-union Kentucky corporation engaged in the business of mining coal for sale to various purchasers. Plaintiff Alley-Cassetty Coal

Company is a Tennessee corporation that acts as a broker in arranging contracts for the sale of coal (the two plaintiffs will hereinafter be referred to collectively as Hoke). The defendant, TVA, is a government corporation created by Congress. The purposes and powers of TVA are set forth in the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831, *et seq.* (the Act). Generally speaking, the purposes and powers of TVA relate to the interest of the national defense, agricultural and industrial development, improvement of navigation, and flood control. Among its many functions, TVA operates an integrated electric power system which supplies power to an area covering roughly 80,000 square miles in parts of seven states. A portion of TVA's generating capacity is supplied by coal-fired plants, and the instant dispute arises from unsuccessful contract negotiations between TVA and Hoke regarding the sale of coal by Hoke to TVA.

In the order of February 18, 1987, issued by the district court, the facts of this case are summarized in pertinent part as follows:

This action arises from unsuccessful contract negotiations between TVA and Hoke for the purchase of coal by TVA. In October of 1981, TVA solicited offers for contracts to supply coal to the Paradise Steam Generation Plant near Drakesboro, Kentucky. In accordance with TVA's procurement policy, offers were solicited by issuance of a document entitled "Requisition 62." Requisition 62 was a solicitation for a negotiated procurement rather than a competitive bid procurement. In this type of solicitation, contracts for coal are awarded on the basis of a bid arrived at *after* negotiations between the offerors and TVA and not as a result of a competitive bidding process. Final award of the contract was subject to approval by the TVA Board.

Among the bidders on Requisition 62 was The Hoke Company (hereinafter Hoke), a nonunion coal producer. Hoke prepared and submitted an offer of coal at $1.3022 per million BTU to TVA. This proposal apparently preliminarily satisfied the requirements and specifications set forth by TVA in Requisition 62, and thereafter, TVA entered into negotiations with Hoke. During these negotiations, Hoke claims that it raised the question of whether its nonunion status would affect TVA's consideration of Hoke's offer. Hoke claims that it informed TVA officials at that time that it did not wish to continue in the negotiations if TVA was only going to award the contract to a union producer. At each negotiation meeting, Hoke claims that it was assured by TVA officials that the contract award would not be affected by the labor affiliation or nonaffiliation of the producers.

In June of 1984, the TVA staff recommended acceptance of Hoke's bid and two other low bids to the TVA Board of Directors. On July 29, 1982, the TVA Board of Directors held a closed "agenda meeting." At this meeting, TVA Board members considered the agenda for its upcoming meeting scheduled July 17, 1982. The agenda for that meeting included the recommendation to accept Hoke's offer. After some deliberation, the Board decided to remove the recommendation from the agenda and directed the TVA staff to reconsider the amounts of coal solicited in light of TVA's coal requirements.

The TVA staff sent a revised recommendation to the Board on July 8, 1982, recommending acceptance of only AMCA Resources, Inc.'s, (AMCA's) offer under Requisition 62. AMCA, a union producer, was the lowest bidder under Requisition 62, offering to sell coal to TVA at a price of $1.1962 per million BTU. The Board approved the award of the contract to AMCA at its July 20, 1982 meeting. TVA informed Hoke of its decision by letter dated September 14, 1982.

(Emphasis in original).

Following TVA's notification to Hoke of the decision to award the contract to AMCA, Hoke filed suit against TVA in the United States District Court, Western District of Kentucky, based on Hoke's claim that the sole reason that TVA rejected

Hoke's bid was because Hoke is a non-union coal producer.[1] In the district court, Hoke asserted the following: breach of an implied contract; promissory estoppel; violation of TVA Act § 9(b), 16 U.S.C. § 831h(b); violation of TVA procurement regulations; breach of public policy; violation of the equal protection clause of the fifth amendment; and violation of the first amendment. TVA filed a motion to dismiss, or in the alternative, for summary judgment. On February 18, 1987, the district court issued the order quoted above, granting TVA's motion as to each claim alleged by Hoke.[2] On appeal, Hoke claims that the district court erred when it failed to find (1) that TVA had exceeded or violated its congressional grant of authority when TVA chose not to award the contract to Hoke; (2) that Hoke had standing to assert its employees' first amendment right

to freedom of association and that TVA had violated that freedom by not awarding the contract to Hoke; and (3) that TVA had violated the equal protection clause of the fifth amendment when it declined to award the contract to Hoke.

## II.

### A. TVA's authority to award the contract to AMCA.

Hoke claims that when TVA chose to award the coal purchase contract to AMCA, a unionized coal producer, TVA was acting in a manner either beyond or in violation of its authority as delegated by Congress.[3] In the February 18, 1987, order issued by the district court, the court responded by finding that under 16 U.S.C. § 831h(b), which is the TVA competitive bidding statute,[4] Hoke had no standing to

1. In December of 1980, truck deliveries of coal to Paradise by non-union contractors had been interrupted by union picketing and violence. These events led to injunctive suits by TVA and the National Labor Relations Board (NLRB) and to a separate administrative proceeding. The NLRB administrative proceeding terminated with a stipulation, approved by the NLRB on March 5, 1982, just a few months prior to the TVA Board's decision not to award the coal purchase contract to Hoke. In that stipulation, the United Mine Workers agreed not to engage in similar disruptive conduct in connection with future non-union deliveries of coal to Paradise.

2. In response to the district court's holding that Hoke lacked standing to assert on behalf of its employees their first amendment right of association, seven Hoke employees moved to intervene as plaintiffs in this action. Almost simultaneously, the original plaintiffs moved to alter or amend the district court's February 18 order. On August 11, 1987, the district court denied both the motion to intervene and the motion to alter or amend the court's February 18 order. Plaintiffs and the movants for intervention both appealed to this court. On November 3, 1987, however, the movants for intervention voluntarily dismissed their appeal.

On June 29, 1987, the same seven Hoke employees filed a separate action against TVA in the district court seeking unspecified money damages and a decree requiring that TVA award Hoke a coal contract. TVA filed a motion to dismiss, or in the alternative, for summary judgment. On November 16, that action was also dismissed on plaintiff's own motion for voluntary dismissal.

3. We reiterate that AMCA, a union contractor, was the lowest bidder under Requisition 62,

offering to supply coal to TVA at the price of $1.1962 per million BTU. Hoke, a non-union contractor, was the second lowest bidder, offering to sell coal to TVA at $1.3022 per million BTU. Hoke claims, however, that TVA exercised an unauthorized preference for union contractors when it determined to award the coal purchase contract to AMCA. We note at the outset that Hoke labels TVA's award of the contract to the lowest bidder, AMCA, as a "union contractor preference." It is interesting, however, that essentially what Hoke seeks is a preference for the award of the TVA contract to the second lowest bidder based on its non-union status.

4. 16 U.S.C. § 831h(b) provides in pertinent part:

All purchases and contracts for supplies or services, except for personal services, made by the Corporation, shall be made after advertising, in such manner and at such times sufficiently in advance of opening bids, as the Board shall determine to be adequate to insure notice and opportunity for competition ... *Provided further,* That in comparing bids and in making awards the Board may consider such factors as relative quality and adaptability of supplies or services, the bidder's financial responsibility, skill, experience, record of integrity in dealing, ability to furnish repairs and maintenance services, the time of delivery or performance offered, and whether the bidder has complied with the specifications.

... *Provided,* That subject only to the provisions of this chapter, the Corporation is authorized to make such expenditures and to enter into such contracts, agreements, and arrangements, upon such terms and condi-

make such a challenge. In reaching this conclusion, the lower court cited *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), a case in which the Supreme Court held that competitive bidding statutes are created for the protection of the government, rather than for the protection of offerors, and such statutes confer no litigable rights on disappointed offerors.

In *Lukens Steel,* producers of iron and steel sought to enjoin the Secretary of Labor, and other officials and agents authorized to make purchases for the government, from imposing a minimum wage requirement, as set by the Secretary in accordance with the Public Contracts Act of June 30, 1936.[5] In concluding that plaintiffs lacked standing to raise their claim because the Public Contracts Act afforded no basis for such a claim, the Court stated:

> We find nothing in the Act indicating any intention to abandon a principle acted upon since the Nation's founding under which the legislative and executive departments have exercised complete and final authority to enter into contracts for Government purchases.

*Id.* at 128, 60 S.Ct. at 877. In other words, in the absence of an indication of congressional intent to confer the right to bring suit against the government regarding its power to enter into contracts, disappointed offerors may not invoke judicial review of the government's activities in that respect.

The district court also cited *Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080, 1086 (6th Cir.1975), wherein the Sixth Circuit stated:

> Rather, we view the present case as dealing with an exception recognized in *Lukens Steel,* 310 U.S. at 125, 60 S.Ct. 869 [at 875], where Congress has by "constitutional legislation" recognized the legal right of a bidder for government contracts to benefit from the policy of granting a fair share of such contracts to small business concerns. Standing is

conferred by Section 10 only when a relevant statute indicates congressional intent that the person or firm seeking review comes within the zone of interests sought to be regulated or protected. Absent such a congressionally created exception, the general rule of *Perkins v. Lukens Steel, supra,* that a disappointed bidder has no legally enforceable right against the government's award of a procurement contract retains its validity.

Unlike the conclusion reached in *Lukens Steel,* this court determined in *Cincinnati Electronics* that the plaintiff, an unsuccessful bidder, did in fact have standing to challenge the award of a government contract to another bidder because, in that particular instance, Congress had expressly created an exception to the general rule in *Lukens Steel.* The court in *Cincinnati Electronics* based its decision on the congressional statement in the "Declaration of Policy" of the Armed Services Procurement Act, 10 U.S.C. § 2301, *et seq.* (which was the Act in question in *Cincinnati Electronics* ), which reads in pertinent part as follows:

> It is the policy of Congress that a fair proportion of purchases and contracts made under this chapter be placed with *small business concerns.*

10 U.S.C. § 2301(b) (emphasis added). In concluding that the plaintiff in *Cincinnati Electronics* had standing, the court reasoned as follows:

> This statement indicates a "zone of interests" sought to be protected by the Act. We hold that an unsuccessful bidder under this Act *who alleges that it is a small business concern* and that an agency representative has acted illegally in failing to follow regulations designed to implement the congressional policy of awarding a fair proportion of contracts under the Act to small business concerns has standing to seek judicial review of such actions pursuant to 5 U.S.C. § 702.

---

tions and in such manner as it may deem necessary. . . .

5. The plaintiff-producers were required to comply with the minimum wage requirements in order to qualify for consideration in the award of a government contract under the Act.

*Cincinnati Electronics,* 509 F.2d at 1086 (emphasis added). The basis for the distinction between the finding in *Lukens Steel* (i.e., that disgruntled bidders did not have the right to invoke judicial review of the manner in which the government dispatches its own internal affairs) and the finding in *Cincinnati Electronics* (i.e., that the disgruntled bidders therein did have standing to bring suit) is based upon the fact that in *Lukens Steel,* Congress had not delineated a right in the plaintiffs to challenge the exercise of the government's power to enter contracts, while in *Cincinnati Electronics,* Congress had delineated such a right. In other words, the plaintiff in *Cincinnati Electronics* fell within the "zone of interests" sought to be regulated or protected by the statute in question, while the plaintiffs in *Lukens Steel* did not. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970) (plaintiff must allege (1) "that the challenged action has caused him injury in fact"; and (2) that the interest·sought to be protected "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question").

Hoke concedes on appeal that "[w]ith the benefit of hindsight, those cases [cited by the district court] have come to be understood more clearly as holding that the competitive bidding requirements of Section 9(b) [16 U.S.C. § 831h(b) ] do not exist for the benefit of perspective [sic] bidders and thus do not create a substantive cause of action for a disappointed bidder after TVA awards the contract to another bidder." Hoke argues, however, that the district court erroneously misinterpreted and/or mischaracterized Hoke's claim, and that Hoke does indeed have standing to bring suit against TVA because the basis of Hoke's claim is that TVA is acting in excess of its statutory authority.[6] Hoke has

failed, however, to articulate the nature of the alleged distinction between the district court's assessment of Hoke's argument and the argument which Hoke presents herein, and we are unable to discern a distinction of significance.

■ In *Lukens Steel,* the Court stated: Courts should not, where Congress has not done so, subject purchasing agencies of Government to the delays necessarily incident to judicial scrutiny at the instance of potential sellers, which would be contrary to traditional government practice and would create a new concept of judicial controversies.

310 U.S. at 130, 60 S.Ct. at 878. Hoke has failed to show that its claim falls within any legislative exception to the general rule of *Lukens Steel.* Therefore, under the circumstances presented here, Hoke is without standing to challenge the propriety of TVA's award of the purchase contract to AMCA. *Lukens Steel; Cincinnati Electronics.*

■ Even assuming, *arguendo,* that Hoke did have standing to challenge TVA's award of the contract in question to AMCA, we conclude that TVA did not exceed its authority in making that award. Section 831c(d), 16 U.S.C. § 831c(d), confers upon TVA the power to contract; and section 831c(g), 16 U.S.C. § 831c(g), confers upon the TVA "such powers as may be necessary or appropriate for the exercise of the powers herein specifically conferred upon the Corporation." The TVA Act is to be "liberally construed to carry out the purposes of Congress...." *See also United States v. An Easement and Right–of–Way,* 246 F.Supp. 263, 269 (W.D.Ky.1965), *aff'd,* 375 F.2d 120 (6th Cir.1967) ("In interpreting the scope and statutory and constitutional authority of the TVA, this court is required to construe the TVA Act liberally...." *Citing United States ex rel.*

---

6. The only case upon which Hoke relies in making this argument is *Owen of Georgia, Inc. v. Shelby County,* 648 F.2d 1084 (6th Cir.1981). *Owen of Georgia* does not provide authority in this case, however, because despite the fact that the plaintiff therein was found to have standing to challenge the state's rejection of his bid, fed-

eral jurisdiction in *Owen* was based on diversity and the *Owen* court's interpretation of the doctrine of standing was based on "the ruling that we believe the highest Tennessee court would adopt" in interpreting its own state law. *Id.* at 1088.

*Tennessee Valley Authority v. Welch,* 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946)). TVA has been given broad authority by Congress to enter into contracts in order to carry out TVA's powers. This authority has been described by one court as follows:

> 5 U.S.C. § 701(a) provides that the Administrative Procedure Act does not apply where "agency action is committed to agency discretion by law." The court can think of no stronger statutory language vesting an agency with discretion than that found in § 831h(b). As an example of the legislative history affirming this discretion, TVA points to the Contract Disputes Act of 1978. This statute, which was designed to resolve disputes relating to government procurement contracts, exempts TVA from its operation. *See* 41 U.S.C. § 607(h). The purpose of such an exemption was
>
>> to maintain the status quo regarding the traditional flexibility and independence of the Tennessee Valley Authority ... It is recognized that the Tennessee Valley Authority has highly specialized purchasing needs and that it must have the freedom to exercise its business judgment in individual instances to be able to maintain the efficiency of its operations.
>
> 124 Cong.Rec.S. 18, 640–41 (daily ed. Oct. 12, 1978) (remarks of Sen. Byrd).

*PRI Pipe Supports v. Tennessee Valley Authority,* 494 F.Supp. 974, 977 (N.D.Miss. 1980). Hoke has failed to persuade us that TVA, in this instance, exceeded the broad authority with which it has been vested by Congress to enter contracts particularly where, as here, TVA has awarded the contract to the lowest bidder.[7]

The district court's grant of summary judgment in TVA's favor on this claim is affirmed.[8]

**B. The Hoke Employees' First Amendment Right to Freedom of Association**

Hoke claims that when TVA awarded the coal purchase contract to AMCA, a union contractor, TVA violated Hoke's "employees' first amendment right to freedom of association by penalizing them, through their employer, for their exercise of the fundamental right to remain nonunion." Finding that Hoke lacked standing to assert its employees' first amendment right to freedom of association, the district court dismissed this claim.

The employees of Hoke have exercised their first amendment right to freedom of association and have made the decision to remain nonunion. In light of the harmony of interest between Hoke and its employees regarding the employees' first amendment right to remain nonunion, as the exercise of that right relates to TVA's decision to award the contract in question to AMCA, a non-union supplier, we have some doubts regarding the correctness of the district court's determination that Hoke is without standing to raise this issue on its employees' behalf. We find it unnecessary to address this standing question, however, because even if Hoke was found to have standing to raise this issue on its employ-

---

7. We reject Hoke's contention that the posture of this case on appeal is such that we must assume the *only* reason for not granting a contract to Hoke was its non-union status. It is clear from Judge Johnstone's opinion (if not from his order) that the court granted a summary judgment motion not a motion to dismiss. Therefore, we are free to review this matter on the basis of the entire case file, not just Hoke's pleadings, even if Judge Johnstone, for the purpose of deciding the motion, accepted all of plaintiff's allegations as true.

8. Hoke also argues that the district court's ruling violates the teaching of *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). In *Catholic Bishop,* the Supreme Court held that in the absence of a clear expression of congressional intent to bring within the jurisdiction of the NLRA those teachers working in church-operated schools, the NLRA would not be construed "in a manner that would in turn call upon the Court to resolve the difficult and sensitive questions arising out of the guarantees of the First Amendment Religion clause." *Id.* at 507, 99 S.Ct. at 1322. According to Hoke, as the result of the district court's dismissal of Hoke's challenge to TVA's award of the coal purchase contract to AMCA, "the Court unnecessarily construed the TVA enabling legislation to authorize TVA to create serious equal protection and First Amendment problems." These "problems" are addressed in the following portions of this opinion.

ees' behalf, Hoke's employees are not entitled to relief on this claim.

The Supreme Court recently issued an opinion in *Lyng v. UAW,* —— U.S. ——, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), a case which also deals with a claim of infringement upon the right to freedom of association. In *Lyng v. UAW,* the Supreme Court examined section 109 of the Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, 95 Stat. 357 (OBRA) which· states in pertinent part that "a household· shall not participate in the food stamp program at any time that any member of the household ... is on strike ... because of a labor dispute ... [and] if the household was eligible for food stamps immediately prior to such a strike ... such household shall not receive an increased allotment as ·the result of a decrease in the income of the striking member ... of the household....·" 7 U.S. C. § 2015(d)(3). The plaintiff labor unions and individual union members in *Lyng v. UAW* argued that the statute interfered or threatened to interfere with the plaintiffs' first amendment right to associate. In response to this argument, the Supreme Court ruled as follows:

> The statute also does not infringe the associational rights of appellee individuals and their unions. We have recognized that "one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means," *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 933 [102 S.Ct. 3409, 3436, 73 L.Ed.2d 1215] (1982), and our recognition of this right encompasses the combination of individual workers together in order better to assert their lawful rights. See, *e.g., Railroad Trainmen v. Virginia,* 377 U.S. 1, 5–6 [84 S.Ct. 1113, 1116–17, 12 L.Ed.2d 89] (1964). But in this case, the statute at issue does not "directly and substantially interfere" with appellees' ability to associate for this purpose. *Lyng* [*v. Castillo* ], *supra* [477 U.S. 635], at 638 [106 S.Ct. 2727 at 2729, 91 L.Ed.2d 527 (1986) ]. *It does not "order" appellees not to associate together for the purpose of conducting a strike and it does not "prevent" them from associat-*

> *ing together or burden their ability to do so in any significant manner.* As we have just stated with respect to the effect of this statute on an individual's decision to remain in or to leave his or her household, it seems "exceedingly unlikely" that this statute will prevent individuals from continuing to associate together in unions to promote their lawful objectives. 477 U.S., at 638 [106 S.Ct., at 2729].

> Prior cases indicate that § 109 has no unconstitutional impact on the right of individuals to associate for various purposes. *Lincoln Union v. Northwestern Iron & Metal Co.,* 335 U.S. 525, 530–531 [69 S.Ct. 251, 254, 93 L.Ed. 212] (1949), for example, held that where a State forbids employers from restricting employment to members of a union, enforcement of that state policy does not abridge the associational rights of unions or their members, despite their claim that a closed shop "is 'indispensable to the right of self-organization and the association of workers into unions.' " Similarly, in *Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. ——, —— [107 S.Ct. 1940, 1947, 95 L.Ed.2d 474] (1987), we held that requiring that association to admit women "does not require the clubs to abandon or alter" any of their activities or their basic goals and therefore did not abridge the members' associational rights.

——, 108 S.Ct. at 1189 (footnote omitted; emphasis added). In concluding that section 109 of OBRA did not interfere with the *Lyng v. UAW* plaintiffs' first amendment right to associate, the Court distinguished the facts of *Lyng v. UAW* from those of *Abood v. Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). In *Abood,* the plaintiff teachers had challenged a state law which required them to pay a fee to their representative union. The Court held that to the extent that the state law allowed these funds to be used to support various political activities with which the teachers did not agree, the law violated the first amendment. In reaching this conclusion, the Court rea-

soned that the "government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment." 431 U.S. at 234, 97 S.Ct. at 1799. In distinguishing section 109 of OBRA from the statute examined in *Abood*, the Court stated in *Lyng v. UAW:* "By contrast, the statute challenged in this case requires no exaction from any individual; it does not 'coerce' belief; and it does not require appellees to participate in political activities or support political views with which they disagree." —— U.S. at ——, 108 S.Ct. at 1191.

■ Nor does TVA's decision not to award the contract in question to Hoke require an exaction from any individual, coerce any belief, or require Hoke employees to become unionized. Applying the analysis of *Lyng v. UAW* to this case, we find that TVA did not "directly and substantially interfere" with the Hoke employees' ability not to associate in a union; and we find further that "it seems exceedingly unlikely" that TVA's decision not to award the contract to Hoke will compel the Hoke employees to forego their right not to associate in a union. We therefore conclude that TVA's decision not to award the contract to Hoke did not amount to a violation of Hoke's employees' first amendment right to freedom of association.

## C. Equal Protection

■ Hoke argues that by choosing to award the coal purchase contract to AMCA, a union contractor, rather than to Hoke, a non-union contractor, TVA discriminated against non-union coal contractors and did so in violation of the equal protection requirement implicit in the fifth amendment of the Constitution. Again we must note the fact that AMCA's bid was the lowest submitted to TVA, while Hoke's was the second lowest. Hoke nevertheless insists that the only basis for TVA's decision to award the contract to AMCA was the fact that AMCA is a union contractor, while Hoke is not. Although we reject this

contention, we will assume, *arguendo*, that it is true for the purpose of analyzing Hoke's equal protection claims.[9]

In *Lyng v. UAW*, the Supreme Court addressed the question of whether union members constituted a protected class for purposes of equal protection analysis and found that they did not. *See also Image Carrier Corp. v. Beame*, 567 F.2d 1197 (2d Cir.1977), *cert. denied*, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979). Likewise, non-union members do not constitute a protected class, nor do union or non-union contractors. Therefore, in addressing Hoke's claim that TVA violated Hoke's fifth amendment right to equal protection, this court must ask whether TVA's classification of the bidders for the coal purchase contract as union versus non-union contractors "is rationally related to a legitimate governmental interest." *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973).

TVA cites its responsibility to supply the electric needs of homes, businesses, industries, and federal installations, including atomic energy plants and military bases, located in an area comprising 80,000 miles and portions of seven states populated by some seven million people. TVA then argues that the Paradise plant is a very important component of the TVA power system, and that the determination not to contract with a non-union coal company, in order to avoid a recurrence of union violence directed at TVA personnel and facilities and a consequent disruption of TVA's normal operations,[10] is a determination rationally related to a legitimate government interest in the effective operation of the TVA power system.

Hoke concedes that prevention of a recurrence of violence directed at the TVA facilities or at those making deliveries to TVA facilities is a legitimate government objective. Hoke also concedes that removing from the scene non-union suppliers who are the object of the violence is a means rationally related to the achievement of the

---

objective of preventing violence. Hoke argues, however, that it is entirely improper to "accept the risk of unlawful violence by third parties as a justification for the TVA's impairment of an innocent party's constitutional rights...."

In response to Hoke's argument that the government may not penalize Hoke because Hoke is a non-union supplier, we note that the Supreme Court has recently reiterated in *Lyng v. UAW* that a governmental "decision not to subsidize the exercise of a right does not infringe the right." — U.S. at ——, 108 S.Ct. at 1190 (quoting *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983)). Rather, the relevant inquiry for this court in reviewing Hoke's equal protection claim is whether an impartial law maker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The Court in *Cleburne* states:

> The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. *Schweiker v. Wilson*, 450 U.S. 221, 230, [101 S.Ct. 1074, 1080, 67 L.Ed.2d 186] (1981); *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 174–175 [101 S.Ct. 453, 459–460, 66 L.Ed.2d 368] (1980); *Vance v. Bradley*, 440 U.S. 93, 97, [99 S.Ct. 939, 942, 59 L.Ed.2d 171] (1979); *New Orleans v. Dukes*, 427 U.S. 297, 303, [96 S.Ct. 2513, 2516, 49 L.Ed.2d 511] (1976). When social or economic legislation is at issue, the Equal Protection clause allows the States wide latitude, *United States Railroad Retirement Board v. Fritz, supra*, [449 U.S.] at 174 [101 S.Ct. at 459]; *New Orleans v. Dukes, supra*, [427 U.S.], at 303, [96 S.Ct. at 2516], and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.

*Id.* at 440, 105 S.Ct. at 3254. We find that the TVA decision to award the coal purchase contract in question to a union contractor, AMCA, under the circumstances presented here, meets this test and therefore withstands Hoke's equal protection challenge. We want to state in the strongest possible terms, however, that we are not ruling that a decision to favor union contractors under different circumstances would necessarily pass muster. The circumstances that allow us to conclude here that there exists a rational basis for TVA's decision not to award the contract to Hoke include the recurrence of the violence against non-union contractors, the fact that the reduced coal needs of TVA resulted in an award to only one supplier with the obvious consequence that interruptions of deliveries from only one supplier would be more critical, and the fact that the award did not result in greater cost to TVA but, rather, lower costs. It would be the most serious of misinterpretations to read this opinion as a carte blanche authorization to favor union contractors over non-union contractors in the award of bids for public contracts without the presence of other relevant extenuating circumstances. AFFIRMED.

BOYCE F. MARTIN, Jr., Circuit Judge, concurring specially.

Although I concur in the result, I write separately to express my disagreement with the majority's analysis of Hoke's claim that the Tennessee Valley Authority violated Hoke's employees' first amendment right to freedom of association. I have two problems with the majority's handling of the issue.

First, I do not believe that the interests of Hoke's non-unionized employees are sufficiently similar to the company's interests so as to justify departing from the general rule that a party may not rest its claim for relief on the legal rights or interests of third parties. For the reasons expressed in the district court's opinion, 661 F.Supp. 740, 748–50, I would hold that Hoke does not have the standing to claim that the Tennessee Valley Authority's actions vio-

lated Hoke's employees' constitutional rights.

I also am troubled by the majority's willingness to skirt this jurisdictional issue and reach the substantive merits of Hoke's claim. Such an approach runs directly counter to fundamental jurisprudential principles. I, therefore, concur in the judgment only.