# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2884
No. 98-2963

_____

| | | |
|---|---|---|
| David Hanten, David Hunter, Kevin Lincoln, Gregory Zimont, K.C. Heating, Cooling and Sheet Metal, Inc., | * * * * * | |
| Appellants/Cross-Appellees, | * * | |
| v. | * * * | Appeal from the United States District Court for the Eastern District of Missouri |
| The School District of Riverview Gardens, Edward Evers, Michelle Gotthardt, David Holtgrefe, Richard Hunt, Kathy Kitchen, Michael Quinlan, Rudy Smith, Chris Wright, | * * * * * | |
| Appellees/Cross-Appellants. | * * | |

_____

Submitted: April 20, 1999
Filed: June 21, 1999

_____

Before BEAM and HANSEN, Circuit Judges, and KOPF,[1] District Judge.

_____

KOPF, District Judge.

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation.

Does a school district's preference for union labor, expressed in construction bid specifications, violate the constitutional right of non-union employees to freely associate when the school district, in conformity with the preference, requires the successful contractor to engage a union-only subcontractor?  We decide that such a preference and the conduct in conformity with that preference do not violate the right of non-union employees to freely associate.

K.C. Sheet Metal, a non-union heating and air conditioning shop, three of its employees and a taxpayer appeal.  The plaintiffs sued the defendant school district, its superintendent and individual board members alleging that they unlawfully prohibited the company and the employees from working on a school building project.

Specifically, the plaintiffs appeal from the district court's[2] decision granting defendants' motion to dismiss Counts I through IV of the first amended complaint, and granting summary judgment on Count V.  See Hanten v. School District of Riverview Gardens, 13 F.Supp.2d 971 (E.D. Mo. 1998).  The defendants cross-appealed the denial of an earlier motion for summary judgment based only on damages.  They concede that the cross-appeal will be moot if this court affirms the district court's dismissal and summary judgment decisions.

We affirm the district court's decision granting dismissal of the complaint regarding Counts I through IV.  We also affirm the district court's decision granting summary judgment on Count V.  The cross-appeal is therefore moot.

## I.  Background

---

[2]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

We first examine the complaint and then review the facts. We proceed to those tasks next.

## A. The Complaint

K. C. Sheet Metal's first amended complaint sought legal and equitable relief under 42 U.S.C. § 1983, Missouri's "Open-Bidding" statute, Mo. Rev. Stat. § 177.086 (West 1999) and Missouri's "Sunshine" law, Mo. Rev. Stat. § 610.010 et seq. (West 1999). The plaintiffs alleged the defendants violated their First and Fourteenth Amendment rights and the state statutes when the defendants removed K.C. from the general contractor's bid and replaced it with a union subcontractor.

They asserted these claims in five counts. In Count I, the K.C. employees, but not the other plaintiffs, claimed a violation of their right to free association. In Count II, K.C. Sheet Metal, but not the other plaintiffs, claimed that it had been deprived of a property interest without due process of law. In Count III, K.C. Sheet Metal and its employees alleged a conspiracy to deprive K.C. of a property interest and to violate the employees' right to free association. Regarding Count IV, the taxpayer alleged a violation of the Missouri "Open-Bidding" statute. In Count V, all of the plaintiffs alleged a violation of the Missouri "Sunshine" law.

The specific allegations pertinent to our discussion are found in paragraphs 9 through 32 of the First Amended Complaint. In those paragraphs they allege the following:

ALLEGATIONS COMMON TO ALL COUNTS
The Union Representation Election

9.  On March 28, 1997, the National Labor Relations Board conducted an election at K.C. to determine whether its Employees, including the Plaintiff Employees, wanted to be represented by Local 36,

Sheet Metal Workers International Association, AFL-CIO ("Sheet Metal Workers Local 36").

10. Sheet Metal Workers Local 36 is a member of the St. Louis Building and Construction Trades Council of St. Louis, AFL-CIO.

11. In the election, K.C.'s Employees (including the Plaintiff Employees) voted to reject Sheet Metal Workers Local 36. In so voting, the Employees exercised their right of free association guaranteed by the First and Fourteenth Amendments of the United States Constitution.

## The Bid Specification

12. On or about May 30, 1997, the Board of Education of the Riverview Gardens School District issued a bid specification ("Specification") soliciting sealed bids for construction of the Moline Elementary School ("the School Project").

13. The Specification "encouraged" bidders to enter into a collective bargaining agreement for the School Project "with the St. Louis Building and Construction Trades Council, AFL-CIO" but did not require contractors to enter into such collective bargaining agreements.

14. The Specification stated that all subcontractors were covered by the terms and conditions of the General Contract.

## The Wachter Bid

15. One of the companies who submitted a bid for the School Project was Wachter, Inc. ("Wachter").

16. In compiling its bid, Wachter solicited proposals for the Project from various subcontractors, including K.C.

17. K.C.'s mechanical subcontracting bid was the lowest responsible mechanical subcontractor bid submitted to Wachter for the School Project. Accordingly, Wachter listed K.C. as the mechanical

-4-

subcontractor in the bid Wachter submitted to the School Board (the "Wachter Bid Documentation").

18.     At the time Wachter submitted its Bid Documentation listing K.C. as the mechanical subcontractor, the two companies had had extensive prior dealings as general contractor and subcontractor on construction projects, including publicly-funded projects.

19.     In accordance with the Specification, Wachter had listed on its Bid Documentation all of the subcontractors whose bids it planned to incorporate into its bid for the School Project and whom it planned to use to perform subcontracting work on the School Project.

20.     Of the eighteen subcontractors listed in the Wachter Bid, only K.C. and the electrical subcontractor (Crown Electrical Contracting, Inc.) were not signatory to an AFL-CIO collective bargaining agreement.

The Contract Award

21.     The bids for the School Project were publicly opened and read aloud on the morning of June 24, 1997. Wachter was the low bidder, with a bid of $4,868,550.00.

22.     When Wachter learned that it was the low bidder, a Wachter representative contacted K.C. to advise that they had won the job and that K.C. should get ready for work.

23.     On the evening of June 24, 1997, the School Board was scheduled to hold a meeting at which it was to vote on the award of the contract for the School Project. The written agenda for the School Board meeting did not properly specify any closed session for review or consideration of the bids on the School Project.

24.     On information and belief, at some time after the issuance of the Specification on or about May 30, 1997, and prior to the vote on the bid award during the School Board meeting on June 24, 1997, the School Board went into an improper closed session in violation of the Missouri

-5-

Sunshine Law (§ 610.010 *et seq.*, R.S. Mo.) for the purpose of secretly changing the Specification to prohibit the use of any subcontractor on the School Project whose employees were not represented by an AFL-CIO union.

25. Upon information and belief, this improper closed session was:

a. a single meeting attended by a quorum of the School Board; or

b. a series of meetings attended by different members of the School Board (sometimes including defendant Wright), with each such meeting involving numbers less than a quorum but totaling a quorum when taken together, all for the purpose of avoiding the requirements of the Sunshine Law in order that the School Board could conduct secret deliberations and make a secret decision to deviate from the Specifications, with a public meeting thereafter held to ratify the consequences of the policy decision that had been made in private.

26. On information and belief, during the closed session or sessions the School Board decided to secretly change the Specification and eliminate all subcontractors whose employees were not represented by an AFL-CIO union.

27. Thereafter, the School Board voted to award the contract for the School Project to Wachter at a cost of $5,321,674.00, which was $453,124.00 above Wachter's original "winning" bid. A material portion of this $453,124.00 increase was due to the additional cost of substituting mechanical and electrical subcontractors who are signatory to AFL-CIO collective bargaining agreements.

28. The School Board member who made the motion to approve Wachter's bid at the increased amount was Rudy Smith. At all times relevant to this matter, Rudy Smith was a paid business agent for the Pipefitters Association, Local Union 562 ("Pipefitters Local 562"), which is a member of the St. Louis Building and Construction Trades Council,

AFL-CIO.

29.     On June 25, 1997, K.C. and Crown Electrical Contracting, Inc., were informed that they would not be performing subcontract work on the School Project because only subcontractors whose Employees are represented by and associated with an AFL-CIO union would be retained to perform work on this Project.

30.     The mechanical subcontractor that replaced K.C. is signatory to collective bargaining agreements with both Sheet Metal Workers Local 36 and Pipefitters Local 562.

31.     On information and belief, the other sixteen subcontractors who were listed on Wachter's Bid Documentation have been retained by Wachter to perform the subcontracting work on the School Project as specified in Wachter's original Bid.

32.     Defendants forced the removal of K.C. and the Employees from the School Project because K.C.'s Employees are not represented by or associated with an AFL-CIO union.

## B.  The Facts

In 1996 the voters in the Riverview Gardens School District passed a bond issue to fund the expansion of four grade schools and to build a new facility, Moline Elementary.  There is no doubt that organized labor had been influential in the passage of the bond issue.

As overcrowding was a big problem in the district, completion of the new construction on time was critical.  The school board and its superintendent wanted a peaceful construction project to maintain the ambitious one-year construction schedule.  The board members agreed that the presence of non-union contractors would result in picketing and other work stoppage problems.  It was the opinion of at least four board

-7-

members that they should award the construction contracts to companies that had reached labor agreements for the project with the St. Louis Building and Construction Trades Council and AFL-CIO unions.

They achieved this consensus through casual discussion at social gatherings. These discussions took place at private residences, school sporting events or school plays. No quorum was present at any gathering. No formal vote was taken or recorded.

As a result of her conversations with some of the board members, the school superintendent directed legal counsel to draft language for the bid specifications that preferred union contractors. The specifications also preferred workers who had completed a Department of Labor-approved apprenticeship program. The specifications also required all bidders to include in their bid package a list of their subcontractors. They included this provision so the school district could exercise control over which subcontractors worked on the Moline project.

Five contractors submitted bids to build the Moline project. The sealed bids were opened at 10:00 a.m. on June 24, 1997, at the school district's administration building. The district's architect read the dollar amounts aloud. Wachter was the lowest bidder. Wachter's bid was lower than its nearest competitor by $175,700. Wachter listed its subcontractors, as required by the district. Two of the subcontractors did not have contracts with the St. Louis Building and Construction Trades Council. K.C. Heating and Air was one of the non-union subcontractors.

The district's architect reviewed Wachter's bid and noticed K.C. was one of the subcontractors on Wachter's list. The architect knew K.C. had been picketed on other jobs because of its non-union status. The architect also wrongly believed workers in a non-union company could not complete an apprenticeship program, yet Wachter had certified that all the workers covered by its bid had completed apprenticeship training.

Curious, the district's architect called Wachter's president to confirm the non-union status of K.C. and to ask about the apprenticeship certifications. Wachter's president, Kamp, said he had bids from other subcontractors who were union subcontractors and he was willing to substitute those contractors for K.C. Kamp also indicated he believed the apprenticeship certification requirement in the bid documents applied only to Wachter employees. In any event, and because of the inquiry by the architect, Kamp submitted a revised bid by "fax." Kamp also sent a letter with his revised bid that expressed his preference for using subcontractors that had union agreements. Even with this substitution, the Wachter bid was still the lowest bid although the Wachter bid increased by $112,374 with the use of union subcontractors.

Later in the day on June 24, 1997, but before the school board meeting that night, the architect, the school superintendent and the assistant superintendent met to review the bids on the Moline project. The architect reported on his telephone call with Kamp earlier in the day. He explained that Wachter's bid originally included two non-union subcontractors, but that Wachter had later revised its bid to reflect an all-union job and had advised that it would be Wachter's preference to do the job with all-union subcontractors. The architect explained Wachter's bid was still the lowest, even after substituting the two union subcontractors. At the conclusion of the meeting, the staff prepared a one-page sheet listing the five bidders and their gross bid amounts. The bid amount for Wachter reflected the increased price resulting from the substitution of subcontractors.

During the board meeting of June 24, and after receiving the one-page bid-sheet, it was moved that the Wachter bid be accepted. The board members accepted the bid unanimously without discussion. The bid sheet, which did not list the names of subcontractors, reflected that Wachter's bid was the low one. None of the board members were aware that K.C. Sheet Metal had submitted a proposal to Wachter or that Wachter preferred union labor.

Rudy Smith moved the acceptance of the low bid. Smith was a union organizer. Smith previously tried to organize K.C. Sheet Metal for Pipefitter Union, Local 562. Smith had been unsuccessful in his organizational efforts. In addition, three months before the bidding, some, but not all, of the employees of K.C. had voted against being represented by a union. To be specific, the employees rejected a bid for representation by Sheet Metal Workers Local 36 (a member of the St. Louis Building and Construction Trades Council), in an NLRB election.

The evidence establishes that neither Smith nor any of the other defendants were aware of the NLRB election when they accepted the bid. In fact, as indicated earlier, the evidence establishes that when they accepted the Wachter bid no board member knew that K.C. had submitted a proposal to Wachter. For the superintendent, the evidence establishes that she knew nothing relevant about K.C. except that it was a non-union shop; that is, she was unaware of the NLRB election and there is no evidence that she knew of Smith's previous effort to organize K.C.

## II. Discussion

Now, on appeal, we review the district court's Rule 12(b)(6) dismissal *de novo*. See, e.g., Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir.1999). We will not affirm a dismissal of a complaint for failure to state a claim unless the plaintiff can prove no set of facts that would demonstrate an entitlement to relief. See id. When analyzing a 12(b)(6) dismissal, we accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiff. See id. "At a minimum, however, a complaint must contain facts sufficient to state a claim as a matter of law and must not be merely conclusory in its allegations." Springdale Education Association v. Springdale School District, 133 F.3d 649, 651 (8th Cir. 1998).

We must also review the district court's decision to grant the motion for summary judgment *de novo*, applying the same standard as did the district court. See,

e.g., Russell v. Men's Wearhouse, Inc., 170 F.3d 1156, 1157 (8th Cir. 1996). We view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences. See id. However, summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

## A. Count I--Freedom of Association

The fundamental assertion of the plaintiffs' complaint is that the defendants "forced the removal of K.C. and the Employees from the School Project because K.C.'s Employees are not represented by or associated with an AFL-CIO union." (Am. Compl. ¶ 32.) We assume that this allegation is true.

From this premise, the K.C. employees argue that the defendants violated their right to freedom of association under the First and Fourteenth Amendments. They suggest that such a preference is inherently and facially coercive. We disagree.

## 1.

There is no doubt that "the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments." Abood v. Detroit Board of Education, 431 U.S. 209, 233 (1977). Moreover, the right of free association presupposes a freedom not to associate. Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984). However, not every governmental practice that might conceivably impose upon a citizen's freedom to associate is actionable. Indeed, we agree with the district court that the school district was entitled to engage in conduct that incidentally inhibited protected forms of association like non-union membership so long as that conduct was rational and was related to a legitimate governmental purpose. Lyng v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, 485 U.S. 360, 366 (1988) (upholding statute

-11-

that prohibited striking workers from receiving food stamps).

In Lyng the Court conducted a rational-basis review of a statute prohibiting households from participating in the food stamp program or from receiving increased allotments while any member of the household was out on strike. The court concluded that no stricter standard was warranted because the statute did not "directly and substantially interfere" with the striking-workers' right to freely associate. Lyng, 485 U.S. at 365-66. In the Court's view, it seemed "'exceedingly unlikely' that this statute will prevent individuals from continuing to associate together in unions to promote their lawful objectives." Id. at 366.

Just as Lyng applied to a practice that might conceivably, but incidentally, harm union members, we are persuaded that the Lyng analysis should apply where the governmental practice might conceivably, but only incidentally, impact non-union members. We think Lyng is applicable to a governmental preference for union labor in the construction industry because such a preference does not "directly or substantially interfere" with the rights of laborers to refrain from joining a union.

We emphasize that the complaint fails to allege in nonconclusory terms that the union preference is likely to "directly or substantially interfere" with the rights of K.C. employees. For example, there is no claim that such a preference is likely to coerce these employees to join a union. There is no claim that there was a shortage of work. There is no claim that any of the employees lost wages or were likely to suffer wage losses as a result of the preference. Moreover, there is no claim that a union preference would likely cause the employees to quit working for K.C. There is not even an assertion that the K.C. employees would do something as a result of the preference that they would not have done had there been no preference. As a result, we find it "exceedingly unlikely" that the preference would prevent K.C. employees from exercising their right not to join a union.

Therefore, if <u>Lyng</u> applies, as we think it does, the preference that bidders on the school project be signatories to an agreement with an AFL-CIO union will withstand scrutiny so long as that specification is rationally related to a legitimate governmental purpose. We believe that when the government, acting like a private business, states a preference for union labor in construction bid specifications, such a preference is facially rational.

The preference for union labor at a construction project is based upon the desire to avoid expensive and time consuming workplace disruptions, and that purpose is clearly legitimate as well as rational. On this point, precedent supports the school district. <u>See</u>, e.g., <u>Woelke & Romero Framing, Inc. v. NLRB</u>, 456 U.S. 645, 662 n.14 (1982) (applying the National Labor Relations Act; upholding "subcontracting clauses" in construction industry contracts that prohibited a contractor from subcontracting work at a construction site except to a subcontractor that had an agreement with a union; the Court stated that "reducing jobsite friction is a legitimate purpose" and "the clauses at issue here serve this goal by ensuring that members of the respondent unions need not work alongside nonunion employees")[3]; <u>Plumbers Union v. City of Omaha</u>, 946 F.2d 599, 600 (8th Cir. 1991) (applying rational basis test to reject freedom-of-association claim by members of union regarding Omaha ordinance mandating that four-member city plumbing board consist of two union and two non-union plumbers) (quoting <u>Lyng</u>); <u>Hoke Co., Inc. v. Tennessee Valley Authority</u>, 854 F.2d 820, 828 (6th Cir. 1988) (rejecting freedom-of-association claim; holding that Tennessee Valley Authority's desire to maintain a constant supply of coal and not have deliveries interrupted because of labor strife provided legitimate basis for award to union contractor rather than non-

---

[3]Just like a private business, the defendant school district was performing a proprietary function when it drafted and followed construction bid specifications. As a result, it generally enjoyed the same rights and privileges as any other participant in the labor market. <u>See</u>, e.g., <u>Building and Construction Trades Council v. Associated Builders and Contractors</u>, 507 U.S. 218, 232-33 (1993).

union contractor) (quoting Lyng); Image Carrier Corp. v. Beame, 567 F.2d 1197, 1203 (2nd Cir. 1977), cert. denied, 440 U.S. 979 (1979) (holding that a rational basis exists for a city policy favoring union printers over non-union printers).[4] See also Vincent E. Mcgeary and Michael G. Pellegrino, Project Agreements and Competitive Bidding: Monitoring the Back Room Deal, 19 Seaton Hall Legis. Rev. 423, 444-45 (1995) (while questioning the wisdom of union-only stipulations, the authors note that "[a]pplying minimum rationality, the judiciary operates under the presupposition that the state acts for the public benefit" and the "[c]ourts have accepted that the contracting agency knows best whether a union only requirement is beneficial.") (Footnotes omitted.)

In summary, based upon the allegations of this complaint, the governmental preference for union labor in construction bid specifications is not inherently coercive. Moreover, it is legitimate and rational because it seeks workplace harmony at a construction site where cooperation can be especially critical to the prompt and economical completion of public works. The union preference is, therefore, not facially invalid as a violation of non-union members' right to freely associate. Accordingly, the district court properly dismissed Count I of the first amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).[5]

**2.**

---

[4]The bid accepted by the defendants, even with the change of the subcontractors, was still the low bid. This fact tends to confirm that the defendants' preference was rational. See, e.g., Hoke, 854 F.2d at 829 (noting relevance of the fact that union contractor was the low bidder).

[5]We express no opinion on the advisability of such preferences. In fact, one could argue that such preferences are based upon outdated assumptions. See Image Carrier, 567 F.2d at 1203. Nevertheless, that sort of policy question rests with elected representatives and not the courts. Id.

The complaint contains no factually specific allegation that the plaintiffs were "targets" of a campaign to coerce them to join a union or to punish them for refusing to join a union. Therefore, K.C. Sheet Metal's reliance upon cases imposing the more exacting analysis for retaliation is misplaced. Thus, at the pleading stage, the school district's union-labor preference is not subject to scrutiny beyond "rational basis" review.

Liberally construing the complaint in favor of the plaintiffs, no inference can fairly be drawn that any of the plaintiffs were targeted by the defendants for their non-union associations or views. As a matter of fact, the undisputed evidence establishes that plaintiffs could not fairly make such an allegation.

None of the school board members knew who the subcontractors were at the time the bids were adopted. Although Mr. Smith, a member of the board and a labor organizer, had previously tried to unionize K.C., the evidence establishes that he did not know that K.C. was a possible subcontractor. It would therefore be impossible to infer that Smith or any other board member acted as a result of some animus for K.C. or its employees.

Moreover, the evidence establishes that the superintendent knew nothing of relevance about K.C. except that it had submitted a bid and that it was a non-union shop. The complaint and the evidence therefore fail to provide a reason to believe that the superintendent set out to punish or coerce K.C. and its employees, as opposed to merely following the school board's preference for union labor.

To summarize, there is no allegation that would permit a fair inference that any defendant retaliated against K.C. or its employees because of the plaintiffs' non-union associations or views. Likewise, the undisputed evidence establishes that no such allegation could be made.

-15-

The foregoing having been said, we can quickly distinguish the cases relied upon by the plaintiffs. They rely upon Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996) (holding that the First Amendment protects independent contractors from the termination or prevention of automatic renewal of an at-will contract in retaliation for their exercise of the freedom of speech; stating that the Pickering balancing test, adjusted to weigh the government's interests as contractor rather than as employer, determines the extent of the protection) and O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712 (1996) (holding that protections generally afforded to public employees against being discharged for refusing to support a political party or its candidates also extend to independent contractors). Neither Umbehr nor O'Hare expressly limited or overruled Lyng.

Both Umbehr and O'Hare are plainly First Amendment retaliation cases. In Umbehr the plaintiff complained that he lost his trash hauling contract because the contractor criticized the county and its governing body. 518 U.S. at 672. In O'Hare the plaintiff, a towing operator, alleged that he supported a political opponent of the Mayor and refused to contribute to the Mayor's political campaign, although he was solicited by the Mayor's committee to make a contribution. After the Mayor was reelected, and in retaliation for his lack of support, the towing operator alleged that he was removed from the City's list of those operators receiving calls for towing service. 518 U.S. at 715-16.

As we have previously observed, the complaint in this case fails to allege that any of the defendants retaliated against the plaintiffs. Moreover, the evidence conclusively demonstrates that the plaintiffs could not prove such an allegation if it had been made. In fact, the plaintiffs' complaint, fairly read, alleges only that a preference for union labor, if acted upon, is inherently and facially coercive for the purpose of deciding whether the preference violates the free association component of the First Amendment. Accordingly, Umbehr and O'Hare, dealing as they do with retaliation for political speech, are not applicable here. Therefore, the district court did not err by

-16-

refusing to apply those cases to the plaintiffs' complaint.

## B. Count II--Due Process and Property Interest

K.C. Sheet Metal claims that its due process rights under the Fourteenth Amendment were violated when the company was removed from the Wachter bid. The company argues that it had a reasonable expectancy of winning the subcontract based on a mutually explicit understanding with Wachter. The district court believed that K.C. Sheet Metal's complaint failed to state a claim, and so do we.

To establish a procedural due process violation based upon the loss of a property interest, a plaintiff, like K.C., must first demonstrate that it had a property interest at stake. See, e.g., Marler v. Missouri State Board of Optometry, 102 F.3d 1453, 1456 (8th Cir. 1996). State law determines the sufficiency of the claim of entitlement to a property interest. See, e.g., Bishop v. Wood, 426 U.S. 341, 344 (1976). Under Missouri law an unsuccessful bidder on a construction project has no property right in the contract. See, e.g., State ex rel. Mid-Missouri Limestone, Inc., v. County of Callaway, 962 S.W.2d 438, 441 (Mo. Ct. App. 1998) (stating that unsuccessful bidders for sale of rock and gravel "were not deprived of anything to which they were legally entitled and therefore cannot state a cause of action."); La Mar Construction Co. v. Holt City, R-II School District, 542 S.W.2d 568, 570-71 (Mo. Ct. App. 1976) (construction contract for school; same).

Liberally construing the complaint, K.C., at most, had an expectancy, based upon a deal with Wachter, that since Wachter was the successful bidder, K.C. would be one of Wachter's subcontractors. However, from the point of view of the school district, this expectation was entirely one-sided; that is, K.C.'s expectancy was based upon Wachter's actions rather than actions of the school district. Simply put, a unilateral expectation like the one here is not enough to create a property interest. Associated Builders and Contractors, Inc. v. City of Seward, 966 F.2d 492, 499 (9th Cir. 1992),

cert. denied, 507 U.S. 984 (1993) (city limited bidding on its construction project to contractors and subcontractors who had agreements with a union; the court stated that "as wishful bidders the Contractors have no constitutionally protected property interest in the city's power line renovation project"). See also Independent Enterprises, Inc. v. Pittsburgh Water and Sewer Authority, 103 F.3d 1165, 1178-79 (3rd Cir. 1997) (low bidder for municipal construction contract did not have property interest); Kim Construction Co., Inc. v. Board of Trustees of Village of Mundelein, 14 F.3d 1243, 1245-50 (7th Cir. 1994) (same). Because K.C.'s unilateral expectation that it would be a subcontractor did not amount to a property interest in the job, the district court properly dismissed Count II of the first amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## C. Count III--Conspiracy Based On Counts I and II

In Count III of their first amended complaint, the plaintiffs allege the defendants conspired to violate the employees' right of free association and to deprive K.C. of a property interest without due process of law. Count III merely restates the allegations in Counts I and II as a separate conspiracy claim. But because a claim of civil conspiracy "does not set forth an independent cause of action but rather is sustainable only after an underlying tort claim has been established," and because the claims underlying Count III have both been properly dismissed, Count III of the first amended complaint failed to state a claim for relief as a matter of law. K & S Partnership v. Continental Bank, N.A., 952 F.2d 971, 980 (8th Cir. 1991), cert. denied, 505 U.S. 1205 (1992). Accordingly, Count III was properly dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## D. Count IV--Missouri's "Open-Bidding" Statute

In Count IV of the first amended complaint, David Hanten, as an individual, sued in his capacity as a taxpayer and resident of the school district, alleging the defendants

violated Missouri's "Open-Bidding" statute, Mo. Rev. Stat. § 177.086 (West 1999), when they removed K.C. as a subcontractor from the Wachter bid. We agree with the district court's decision to dismiss the complaint for failure to state a claim.

The plaintiffs' complaint makes no factually specific allegation that the school district failed to award the bid to "the lowest responsible bidder." The undisputed facts confirm that the plaintiffs could not fairly make such an allegation because Wachter got the bid. Wachter was the low bidder even with the substitution of subcontractors.

Section 177.086 provides, in pertinent part:

> No bids shall be entertained by the school district which are not made in accordance with the specifications furnished by them and all contracts shall be let to the lowest responsible bidder complying with the terms of the letting, provided that the said school district shall have the right to reject any and all bids.

The Missouri courts interpret this statute to provide school districts with broad discretion in awarding contracts. See, State ex rel. Page v. Reorganized School District R-VI of Christian County, 765 S.W.2d 317, 320-22 (Mo. Ct. App. 1989); Metcalf & Eddy Services, Inc. v. City of St. Charles, 701 S.W.2d 497, 499-500 (Mo. Ct. App. 1985); La Mar, 542 S.W.2d at 570-71.

In this case the school district's preference for union labor was rationally based on its desire for a peaceful job site, uninterrupted by labor disputes and work stoppages. After following that preference, it selected the low bidder. When, as here, the statute grants a school district broad discretion to reject any and all bids, a school district could not be found to have violated the statute by awarding a contract to the low bidder even though that bid could have been even lower if the school would have waived a preference in the bid specifications. Accordingly, the district court properly dismissed Count IV of the first amended complaint.

### E. Count V--Missouri's "Sunshine" Law

Count V of the first amended complaint alleged that the defendants violated Missouri's Sunshine law, Mo. Rev. Stat. § 610.010 et seq. (West 1999), by conducting either a closed meeting on June 24, 1997, or a series of one-on-one closed meetings prior to June 24, 1997, to ensure non-union subcontractors would be prohibited from working on the Moline project. The district court granted summary judgment on this claim, and the court was correct in doing so.

A portion of the school board meeting on June 24, 1997, was closed, but the only subject discussed during the executive session was a student disciplinary matter. There is no evidence to contradict the defendants' evidence which establishes the subcontractor issue was not discussed during the closed portion of the meeting.

Several of the school board members and the superintendent admit they informally discussed the workforce issue during social occasions at private residences, athletic events or school plays prior to the publication of the project manual that set forth the bid specifications. At no time was there a quorum present for these "discussions." At no time was a formal vote taken or recorded. There is no evidence that these "meetings" were planned for the purpose of discussing the workforce issue.

An informal meeting "of less than a quorum does not constitute a meeting of a public governmental body when there is no intent to avoid the purposes of the Sunshine Law." Colombo v. Buford, 935 S.W.2d 690, 699 (Mo. Ct. App. 1996) (affirming directed verdict; gathering at personal residence attended by some of the school board members was not a public meeting; series of one-on-one personal and telephone discussions between school board members concerning renewal of superintendent's contract was not governed by the "Sunshine" law; three members of school board who traveled to high school to talk with school principal and teachers did not constitute a quorum subject to the "Sunshine" law). The plaintiffs have not presented any evidence

-20-

from which a reasonable fact finder could conclude that any of the defendants intentionally tried to avoid the law.

The district court's decision is strongly buttressed by the fact that the board members could have met in private to discuss whether to put the union-only preference in the bid specifications. In fact, Mo. Rev. Stat. § 610.021(11) (West 1999) states that: "Except to the extent disclosure is otherwise required by law, a public governmental body is authorized to close meetings, records and votes, to the extent they relate to the following: . . . Specifications for competitive bidding, until either the specifications are officially approved by the public governmental body or the specifications are published for bid." Thus, absent persuasive evidence to the contrary, there is no reason to think that the defendants intended to evade the "Sunshine" statute by doing something indirectly that the law permitted them to do directly.

Because there was no dispute of material fact concerning the alleged violation of Missouri's "Sunshine" law, the defendants were entitled to summary judgment on Count V of the amended complaint.

## F. Cross-Appeal

The defendants have appealed the denial of their motion for partial summary judgment as to damages. They concede, however, that this court need not reach this appeal if the plaintiffs' appeal is denied. That being the case, the cross-appeal will be denied as moot.

## III. Conclusion

The judgment of the district court, granting the defendants' motion to dismiss the complaint and the alternative motion for summary judgment, is affirmed. The defendants' cross-appeal is denied as moot.

BEAM, Circuit Judge, concurring.

I concur in the court's opinion. On the record before the court, the opinion well and accurately reflects the state of the law. Nonetheless, I am troubled by having to reach this result and write separately to mention some specific concerns.

The series of informal meetings used to adopt the pro-union bidding policy, apparently orchestrated by the school superintendent and aided, at least in part, by board member Rudy Smith, a paid union organizer, seems to have permitted the school district to skate around barriers erected by the Missouri Sunshine (open meetings) Laws. These procedures, although perhaps technically permissible, obviously led to unfairness to K.C. Sheet Metal and its employees, caused significant increases in construction costs, and prompt me to believe that the interests of all the citizens of the district were not properly and adequately represented in this exercise.

Mr. Smith, in response to K.C. employees' allegations concerning constitutional free association rights, claims that he was totally unaware that K.C. employees had, only weeks prior to the bid letting, voted against union affiliation with a local union member of the St. Louis Building and Construction Council. This claim is surprising, if not virtually unbelievable, given that Mr. Smith himself, acting for his own local union, also a member of the same council, had, at an earlier time, unsuccessfully attempted to organize these same K.C. employees. Indeed, considering all the facts alleged and presented, Mr. Smith's affidavit could have been disregarded by the district court as incredible.

Finally, I express my greatest concern over the school superintendent's activities in seeking to extract the nonunion subcontractors from the low bidder's proposal. Notwithstanding their willingness to adopt policies designed to exclude nonunion entities from this public building project, the school board members, to a person, contend that they knew nothing of K.C.'s low bid at the time Mr. Smith moved the

-22-

adoption of the modified bid proposal at the school board meeting. Assuming the truthfulness of these assertions, it appears that the superintendent, without governing board authorization, secretly altered and then presented changed bid documents to the school board for its required consideration. These modifications occurred as a result of substitutions made in papers forwarded as part of the sealed bid proposals, presumably submitted under the protection of Missouri public bidding statutes. As nearly as I can tell, the school board has expressed no particular concern about this unusual turn of events. This causes me to agree with appellants' observation that the school board and its administrators "wanted an all-union labor force at least in part because they wanted to grant a political favor [at taxpayer expense] to unions that [they] felt had supported the bond issue and not because it would benefit the Project itself." Appellants' brief at 29 (citations to record omitted). If this is in any way accurate, and, as indicated, I believe it may be, every school district taxpayer except, perhaps Mr. Smith and those similarly situated, should be outraged.

As stated, I concur in the court's opinion. However, I lament that it is necessary for me to do so given the facts of this case.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.